[Civ. No. 15738. Fourth Dist., Div. Two. Mar. 11, 1977]

BRUCE JOHNSON, a Minor, etc., et al., Plaintiffs and Appellants, v. HUNTINGTON BEACH UNION HIGH SCHOOL DISTRICT et al., Defendants and Respondents.

2

4

**5**

**COUNSEL**

Christopher Hall and Kenneth A. Roberts for Plaintiffs and Appellants.

Rutan & Tucker and David C. Larsen for Defendants and Respondents.

David A. Lehrer as Amici Curiae on behalf of Defendants and Respondents.

## OPINION

**TAMURA, J.**—Plaintiffs (high school students) sought judicial relief from a refusal of the Huntington Beach Union High School District (district) to permit a voluntary student Bible study club to meet and conduct its activities on the school campus during the school day. The trial court sustained the district's action and denied plaintiffs the relief sought.

The operative facts set forth in the stipulated facts on which the cause was heard and submitted may be summarized as follows: The district is charged with supervising and establishing rules and regulations for high schools within the district. Plaintiffs are students at Edison High School, a public tax-supported secondary school under the jurisdiction of the district.

Pursuant to statutory authority,[1] the district has provided for recognition of student clubs[2] and has prescribed regulations under which such clubs may operate on high school campuses.[3] Under the district's rules,

[1]See Education Code sections 10701, 10702, 10704, 10604, 1052.

[2]The district's "Policy No. 5144" reads:

"Clubs recognized by the board of trustees are those which are sponsored by the individual schools of the district. Clubs shall be responsible to the school through which they are organized. Such clubs may not be secret for, as indicated in the Education Code, it is 'unlawful for any pupil enrolled in any elementary or secondary school in the state to join or become a member of any secret fraternity, sorority or club wholly or partly formed of pupils attending the public schools, or to take part in the organization or formation of any such fraternity, sorority or club. . . .' "

[3]The regulations implementing the district's policy on student clubs are set forth in "Staff Rule No. 5144," which reads:

"*Clubs*

"*School Sponsored*

"*Clubs Recognized*

"Clubs recognized by the individual school will be those sponsored by the school. These clubs must be directly responsible to the school.

"*Charters*

"The organization's charter must be approved by Associated Students' governing body and *by the Principal of the school.*

"*Membership*

"Membership must be limited to the students attending the school, and must be open to all students who meet the qualifications and standards of membership set forth in the club charter.

"*Charter Filing*

"A copy of the charter must be on file in the Principal's office.

"The organization must:

"1. Be sponsored by a member of the faculty appointed by the Principal.

"2. *Deposit all monies* collected and *check out* all monies through the school's financial secretary according to school regulations. All club accounts shall be audited.

student organizations may not have free use of classrooms or school facilities other than by applying for and receiving recognition, i.e., official approval to operate on the campus as a student club. For many years the district has permitted and still permits high schools under its jurisdiction to grant recognition to student clubs and to permit such clubs to use classrooms and other space for club meetings and to publicize their activities through the school newspaper and school bulletin boards. The district did not, however, permit student religious clubs to meet on the school campus during the school day.[4]

On January 8, 1974, the district passed an interim policy resolution permitting student religious clubs to meet on campus during the school day pending legal clarification from the Orange County Counsel and the Attorney General. The county counsel informed the district that it could not constitutionally permit student religious clubs to meet on campus during the school day. Consequently the district rescinded its interim resolution and reinstated its long-standing policy of denying recognition to student religious groups. Subsequently the Attorney General also

"3. Have the approval of the sponsor for the time and place and all activities carried on by the organization, including regular meetings. The sponsor must be present at all meetings.

"4. Request and receive approval from the school Principal for special social events.

"*School-sponsored clubs may be permitted*:

"1. to use official name of the school.

"2. to use building and other facilities.

"3. to have publicity in daily bulletins, bulletin boards and school publications.

"4. to wear identifying emblem but not special clothing.

"5. to sell on school premises tickets or bids to special activities sponsored by the club.

"*Deviations*

"Deviations from any of the requirements may be made only with the approval of the Associated Students' governing body and the school Principal.

"*Private Clubs*

"No off-campus or private clubs are permitted to function in the school. They are also restricted from advertising in any form.

"*Secret Clubs*

"Education Code, Section 16075 [now section 10604], makes it 'unlawful for any pupil enrolled in any elementary or secondary school to join or become a member of any secret fraternity, sorority, or club wholly òr partly formed of pupils attending the public schools, or to take part in the organization or formation of any such fraternity, sorority, or club. . . .'

"*Obligation of the Principal*

"It is the obligation of the Principal to see that the clubs and organizations of the school are not of secret nature and that they are not in any way selective or discriminatory." (Original italics.)

[4]It was stipulated that students, as well as members of the community, may apply for use of school facilities under the Civic Center Act (Ed. Code, § 16551 et seq.) but that the district would not grant an application under the act by a student group to use classrooms or other meeting rooms for religious purposes during the school day.

rendered an opinion supporting the conclusion of the county counsel and the action taken by the district. (59 Ops. Cal.Atty.Gen. 214.)

Over 100 Edison High School students responded to the district's action with a written application seeking formal recognition of a club whose express purpose was "to enable those participating to know God better . . . by prayerfully studying the Bible" and whose membership would be open only to those who "have a genuine interest in the fulfilling of the purpose of this organization."[5] School officials at Edison High rejected the petition and the district's board of trustees did likewise.

Plaintiffs filed suit for injunctive and declaratory relief to establish their claimed rights to official club recognition, to use school classrooms and other space during the school day for club meetings, to use bulletin boards and similar facilities for the posting of club activities, and to have access to the school newspaper for purposes of publicizing club events. The cause was heard on the pleadings and stipulated facts. Following argument and submission, the trial judge rendered an intended decision that school recognition of plaintiffs' Bible study club would impermissibly advance religion and would cause the state to penetrate the federal and state constitutional barriers between church and state.[6] Judgment was entered decreeing that the district was prohibited from recognizing plaintiffs' Bible study club or from assisting plaintiffs in their efforts to form a religious club and that the school's posture of nonrecognition did not violate plaintiffs' free exercise or other First Amendment guarantees. Plaintiffs appeal from that judgment.

■ ■ Plaintiffs do not challenge either the district's authority to promulgate rules for the operation of student clubs on campus or the validity of the existing rules.[7] They attack the judgment below on the

---

[5] The term "Bible" as used in the club's constitution refers to the 66 books collectively referred to as the Old and New Testaments.

[6] Findings of fact and conclusions of law were not requested by either party and none were made.

[7] The entire thrust of plaintiffs' suit in the court below was that they were entitled to recognition of their club and to the use of school facilities under the district's regulations on the same basis and to the same extent as are enjoyed by other student organizations. They made no attack on the validity of the regulations themselves. For the first time on appeal plaintiffs assert that the regulations are void for "vagueness and overbreadth" and for lack of "standards," but they fail to point out in what particulars the regulations are vague or overbroad or lack adequate standards. Failure to support a point by legal argument and discussion may be deemed an abandonment of the contention. (*Huntington Beach Police Officers' Assn. v. City of Huntington Beach*, 58 Cal.App.3d 492, 504 [129 Cal.Rptr. 893].)

ground that there are no federal or state constitutional proscriptions against school authorities permitting plaintiffs' Bible study club to meet and conduct its activities on campus during the school day on the same footing as other student clubs and that refusal to grant such permission violates plaintiffs' First and Fourteenth Amendment rights. From the analysis which follows, we have concluded that the issues were correctly resolved by the trial court and that the judgment should be affirmed.

The First Amendment to the United States Constitution provides in relevant part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. . . ." ██ In erecting a wall of separation between church and state, the framers of our Constitution acted upon the belief " 'that a union of government and religion tends to destroy government and to degrade religion.' [Citation.] When government . . . allies itself with one particular form of religion, the inevitable result is that it incurs 'the hatred, disrespect and even contempt of those who hold contrary beliefs.' " (*Abington School Dist.* v. *Schempp,* 374 U.S. 203, 221-222 [10 L.Ed.2d 844, 857-858, 83 S.Ct. 1560] quoting *Engel* v. *Vitale,* 370 U.S. 421, 431 [8 L.Ed.2d 601, 608, 82 S.Ct. 1261].) ██ Provisions of the First Amendment, including the establishment clause, are subsumed under the due process clause of the Fourteenth Amendment and govern state action. (*Committee for Public Education* v. *Nyquist,* 413 U.S. 756, 760, fn. 2 [37 L.Ed.2d 948, 955, 93 S.Ct. 2955].)

Preservation of religious liberty and the maintenance of governmental neutrality have undergone their severest test in the context of religious exercises within school corridors. In quick succession the Supreme Court of the United States passed upon two "release time" programs which were challenged as violative of the establishment clause. *McCollum* v. *Board of Education,* 333 U.S. 203 [92 L.Ed. 649, 68 S.Ct. 461], put before the court a program whereby the school turned over its classrooms during the school day to religious groups which, one day a week for 30 minutes, substituted religious training for the secular education provided under the compulsory education law. The court held that the use of tax-supported property for religious instruction during a time when students were compelled by law to attend school resulted in the state becoming an active participant in religious affairs and thereby violated its constitutional obligation of neutrality. (333 U.S. at pp. 209-210 [92 L.Ed. at pp. 657-658].)

Sensitive to the religious needs of its pupils but cognizant of its constitutional duties, New York devised a release time program whereby students were released from school to receive spiritual training at the church of their belief. Students were released only upon written request of their parents; those not released remained in the classroom. This program withstood constitutional scrutiny in *Zorach* v. *Clauson,* 343 U.S. 306 [96 L.Ed. 954, 72 S.Ct. 679]; Justices Black, Jackson and Frankfurter dissenting. The court noted that while it is the philosophy of the First Amendment to erect a citadel where neither state nor church would invade the precinct of the other, not all cooperation between the secular and the religious is condemned. (343 U.S. at pp. 312-313 [96 L.Ed. at pp. 961-962].) As much as the state must remain neutral in the affairs of religion, neither can it assume a posture of hostility. (343 U.S. at pp. 313-314 [96 L.Ed at pp. 961-962].) Thus, a course of accommodation involving nothing more than school officials adjusting educational schedules to meet sectarian needs of its students was found consistent with constitutional precepts. (343 U.S. at p. 314 [96 L.Ed. at p. 962].)[8]

A state policy of accommodation, however, can overstep constitutional limits and becomes an impermissible form of aid to religion. In *Abington School Dist.* v. *Schempp, supra,* 374 U.S. 203, school officials instituted a practice whereby passages of the Bible were read without comment at the beginning of each school day. Those students not wishing to participate were permitted to absent themselves. The court noted that although our heritage and culture is in part grounded in the belief in the Almighty (374 U.S. at pp. 212-213 [10 L.Ed.2d at pp. 852-853]), the Constitution mandates governmental neutrality which neither prefers one religion over another nor advances all religion but instead creates a sanctuary where all religions may flourish without governmental interference. (374 U.S. at pp. 217-219 [10 L.Ed.2d at pp. 855-856].) Governmental neutrality and religious freedom, the court observed, can be preserved only by the segregation of secular activity from religious pursuit through the banishment of all governmental allegiance with religion. (374 U.S. at pp. 216-217 [10 L.Ed.2d at pp. 854-855].) The court concluded that state sponsorship of Bible reading during the school day violated the principle of neutrality, placed the state behind religious inculcation and infringed the free exercise rights of nonbelievers. (374 U.S. at pp. 222-227 [10 L.Ed.2d at pp. 858-861]; see also: *Engel* v. *Vitale, supra,* 370 U.S. 421 [prohibiting the recitation of prayer at the beginning of the school day].)

[8]The area of accommodation has been explored by noted commentators. (See: Religion and the Public Order (Giannela edit. 1963) pp. 17-23; Kauper, *Prayer, Public Schools and the Supreme Court* (1963) 61 Mich.L.Rev. 1031, 1066-1068.)

■ In *Lemon* v. *Kurtzman*, 403 U.S. 602, 612-613 [29 L.Ed.2d 745, 755-756, 91 S.Ct. 2105], the high court announced a tripartite test, synthesized from criteria developed by prior decisions, for determining whether state action involves a violation of the establishment clause. To pass constitutional muster the state activity must satisfy three conditions: (1) It must have a secular legislative purpose; (2) its primary effect must neither advance nor inhibit religion; and (3) it must not foster excessive governmental entanglement with religion. (See also: *Meek* v. *Pittenger*, 421 U.S. 349, 358 [44 L.Ed.2d 217, 227-228, 95 S.Ct. 1753] [upholding school textbooks loans to nonpublic school children but invalidating loans of other instructional material made directly to nonpublic schools]; *Committee for Public Education* v. *Nyquist, supra,* 413 U.S. 756, 772-773 [37 L.Ed.2d 948, 962-963] [invalidating a system of tax credits and tuition reimbursements to low income families who sent their children to nonpublic schools].) Failure to meet any one of the three conditions is fatal to the constitutionality of state action. (See e.g., *Committee for Public Education* v. *Nyquist, supra*; *Lemon* v. *Kurtzman, supra*; *Abington School Dist.* v. *Schempp, supra,* 374 U.S. 203.)

No test, however, can be applied with precision in determining where the line between church and state should be drawn; the problem, like many in constitutional adjudication, is one of degree. (*Zorach* v. *Clauson, supra,* 343 U.S. at p. 314 [96 L.Ed. at p. 962].) The high court has cautioned that the tripartite *Lemon* test is to be viewed, not as a formula prescribing the precise scope of constitutional inquiry, but as a touch-stone with which to identify instances where the objectives of the establishment clause have been compromised. (*Meek* v. *Pittenger, supra,* 421 U.S. 349, 358-359 [44 L.Ed.2d 217, 227-228].) ■ The primary evils the clause was intended to protect against are "sponsorship, financial support, and active involvement of the sovereign in religious activity." (E.g., *Meek* v. *Pittenger, supra,* at p. 359 [44 L.Ed.2d at p. 228]; *Lemon* v. *Kurtzman, supra,* 403 U.S. 602, 612 [29 L.Ed.2d 745, 755]; *Walz* v. *Tax Commission,* 397 U.S. 664, 668 [25 L.Ed.2d 697, 701, 90 S.Ct. 1409].) We proceed to apply the foregoing precepts to the case at bench.

The precise question we must decide is whether school officials of a tax-supported high school of the district may permit plaintiffs' Bible study club to meet and conduct its activities on the school campus during the school day under regulations governing student clubs. ■ The administrative action which plaintiffs seek would constitute state action and as such must withstand constitutional scrutiny under the guidelines enunciated in *Lemon* v. *Kurtzman, supra,* 403 U.S. 602.

To the extent that the first prong of the tripartite test may be applicable it is only necessary to observe that the exercise of the power to permit student organizations to conduct their activities on school campuses during the school day in accordance with district rules and regulations is in the abstract secular in nature.

However, in adjudging whether the "primary effect" of the state action sought by plaintiffs advances religion, we must examine its consequence not in the abstract but as applied to the Bible study club. (See *Hunt* v. *McNair,* 413 U.S. 734, 742 [37 L.Ed.2d 923, 930-931, 93 S.Ct. 2868].) In this regard, the Supreme Court has cautioned that the crucial inquiry is not whether some benefit accrues to a religious institution as a consequence of state action, but whether its primary effect advances religion. (*Tilton* v. *Richardson,* 403 U.S. 672, 679 [29 L.Ed.2d 790, 799-800, 91 S.Ct. 2091].) ■ Aid may be said to have an impermissible primary effect of advancing religion "when it funds a specifically religious activity in an otherwise substantially secular setting." (*Hunt* v. *McNair, supra,* at p. 743 [37 L.Ed.2d at p. 931]; *Meek* v. *Pittenger, supra,* 421 U.S. 349, 365-366 [44 L.Ed.2d 217, 231-232].)

■ Plaintiffs do not dispute the fact that the club's mission, "to enable those participating to know God better so that they will be better persons . . . by prayerfully studying the Bible," is religious in nature. It is also apparent that if the club is permitted to meet and conduct its activities on the school campus as a student club as demanded by plaintiffs, state financial support would flow directly to the club. It would be entitled to use classroom space rent free, receive heat and light and would be monitored by a paid faculty sponsor. The district would also be obligated at its expense to audit club finances.[9] One of the factors differentiating *McCollum* from *Zorach* was the free use of school facilities, classrooms, heat and light. (*Zorach* v. *Clauson, supra,* 343 U.S. 306, 308-309 [96 L.Ed. 954, 959-960].) Thus this financial subsidy alone may be sufficient to compel constitutional condemnation of the requested state action.

We do not rest our decision, however, on financial aid alone.[10] ■ The "primary effect" test bespeaks not only of financial

---

[9] See footnote 13, *infra.*

[10] There are advocates of the view that mere use of school property alone is not offensive to the Constitution so long as the religious activity is wholly separate from the official school day. (See, e.g., *Wood* v. *Mt. Lebanon Township School District* (W.D.Pa. 1972) 342 F.Supp. 1293, 1295; *Reed* v. *Van Hoven* (W.D.Mich. 1965) 237 F.Supp. 48,

assistance but also necessarily inquires whether the consequence of state action is to place its imprimatur upon the religious activity. (*Abington School Dist.* v. *Schempp, supra,* 374 U.S. 203, 216-219, 221-222 [10 L.Ed.2d 844, 854-858]; *Engel* v. *Vitale, supra,* 370 U.S. 421, 430-436 [8 L.Ed.2d 601, 607-611]. See also: *Reed* v. *Van Hoven, supra,* 237 F.Supp. 48, 51-53.) This aspect of the effect test reaches the essence of the establishment clause proscription. In *Abington School Dist.* v. *Schempp, supra,* the court cogently observed: " 'The [First] Amendment's purpose was not to strike merely at the official establishment of a single sect, creed or religion, outlawing only a formal relation such as had prevailed in England and some of the colonies. Necessarily it was to uproot all such relationships. But the object was broader than separating church and state in this narrow sense. It was to create a complete and permanent separation of the spheres of religious activity and civil authority by comprehensively forbidding every form of public aid or support for religion.' " (374 U.S. 203, 217 [10 L.Ed.2d 844, 855], quoting *Everson* v. *Board of Education,* 330 U.S. 1, 31-32 [91 L.Ed. 711, 731-732, 67 S.Ct. 504, 168 A.L.R. 1392] [Rutledge, J. dissenting].) The point is that impermissible governmental support is present when the weight of secular authority is behind the dissemination of religious tenets.

It is in the foregoing respect that permitting plaintiffs' Bible study club to meet and operate on the school campus during the school day most offends establishment principles. Under the district's rules and regulations, the club will become an entity "sponsored by the school" and as such will be entitled to use the school name in connection with its activities, to free use of school premises and property, to access to the school newspaper and school posting facilities to advertise its activities, and to solicit contributions on campus during the school day. Thus, the consequence of permitting the club to operate on campus as a recognized student organization is to place school support and sponsorship behind the religious objectives of the club. The Bible study club would implicitly become an integral part of the school's extracurricular program conducted during the school day[11] when students are compelled by law to attend the school.

---

54-57; *Keegan* v. *University of Delaware* (Del. 1975) 349 A.2d 14, 17-18; *Lawrence* v. *Buchmueller* (1963) 40 Misc.2d 300 [243 N.Y.S.2d 87, 88-90]; but see: *Hunt* v. *Board of Education of County of Kanawha* (S.D.W.Va. 1971) 321 F.Supp. 1263, 1266.)

[11]Plaintiffs concede that the lunch hour during which the club proposes to meet is an inseparable part of the school day. (See statutory authorities cited at fn. 12, *infra.*)

The state action which plaintiffs seek would also run afoul of the third prong of the *Lemon* test. ▮ ▮▮▮ The school would be required to supply a "faculty sponsor" who would be required to attend all club functions and approve all club activities.[12] The school would also be required to audit the club's financial accounts[13] and review membership procedures to ensure they are neither secret nor discriminatory.[14] Thus, permitting the Bible study club to operate on campus would foster excessive state entanglement with religion.

An additional factor which cannot be ignored in the context of the establishment clause is the potential for divisiveness in matters of religion which the requested state action to be evaluated may engender. (*Committee of Public Education* v. *Nyquist, supra,* 413 U.S. 756, 797-798 [37 L.Ed.2d 948, 976-978]; *Lemon* v. *Kurtzman, supra,* 403 U.S. 602, 622 [29 L.Ed.2d 745, 761]. See also: *Abington School Dist.* v. *Schempp, supra,* 374 U.S. 203, 298 [10 L.Ed.2d 844, 901] [concurring opinion of Justice Brennan].) Students who are members of less orthodox religions may be unable to organize a club because of insufficient student support or unavailability of a faculty sponsor. In such event, the free exercise rights of the minority might well be infringed by the pressure upon them to conform to the beliefs of the recognized religious club. Even if we assume that the spectrum of religious beliefs present in the national community is represented at the school, there is a real possibility that competing sects or beliefs will vie for school permission to operate on campus. Manifestly this could engender student divisiveness in matters of religious beliefs.

In sum, the school machinery implicated in permitting the student Bible study club to meet on campus under the district's rules and regulations goes far beyond the accommodation endorsed in *Zorach.* There the school cooperated with religious institutions only to the extent

---

[12] A school district is required to maintain supervision over the conduct of its pupils during school hours, including recesses and lunch hours. (Ed. Code, §§ 13557, 13557.5; Cal. Admin. Code, tit. 5, § 303; *Taylor* v. *Oakland Scavenger Co.,* 17 Cal.2d 594, 600 [110 P.2d 1044].) Even if a nonfaculty assumes this function, provision is made for his reimbursement. (Ed. Code, § 20801.)

[13] Education Code section 10704 provides:

"The governing board of any school district shall provide for the supervision of all funds raised by any student body or student organization using the name of the school.

"The cost of supervision may constitute a proper charge against the funds of the district.

"The governing board of a school district may also provide for a continuing audit of student body funds with school district personnel."

[14] Education Code section 10604 prohibits pupil membership in secret clubs.

of adjusting its schedule to make it possible for the students who wished to do so to repair to their respective houses of worship to partake in religious activities off campus. The teachers did not sponsor, participate in, or monitor the religious function. ■ Religion must be a private matter wholly untouched by state involvement or sponsorship. (*Lemon* v. *Kurtzman, supra,* 403 U.S. 602, 625 [29 L.Ed.2d 745, 762-763].) The school permission sought by plaintiffs would meld the secular with the sectarian and would empower the Bible study club members to use the prestige and authority of the school in proselytizing their beliefs among students whose presence on the campus is compelled by law and who may be vulnerable to the pressure of an officially recognized student religious organization. This, the First Amendment will not permit.

To this point we have concerned ourselves only with the federal establishment clause. However, section 4 of article I of the California Constitution contains an establishment clause identical to that of the First Amendment to the federal Constitution.[15] ■ For all of the reasons heretofore stated, we hold that the state action in question is proscribed by the establishment clause of the state Constitution.

■ Furthermore, section 5 of article XVI of the California Constitution also compels us to uphold the school district's action. The section provides in relevant part: "Neither the Legislature nor any . . . school district . . . shall ever make an appropriation, or pay from any public fund whatever, or grant anything to or in aid of any religious sect, church, creed, or sectarian purpose. . . ."[16] In *California Educational Facilities Authority* v. *Priest,* 12 Cal.3d 593 [116 Cal.Rptr. 361, 526 P.2d 513], the court observed: "The section thus forbids more than the appropriation or payment of public funds to support sectarian institutions. It bans any official involvement, whatever its form, which has the direct, immediate, and substantial effect of promoting religious pur-

---

[15]Section 4, article I of the California Constitution revised November 5, 1974, provides: "Free exercise and enjoyment of religion without discrimination or preference are guaranteed. This liberty of conscience does not excuse acts that are licentious or inconsistent with the peace or safety of the State. The Legislature shall make no law respecting an establishment of religion."

[16]Article IX, section 8 of the state Constitution provides in pertinent part: "No public money shall ever be apportioned for the support of any sectarian or denominational school . . . nor shall any sectarian or denominational doctrine be taught, or instruction thereon be permitted, directly or indirectly, in any of the common schools of this State."

In view of our holding that article XVI, section 5 of the state Constitution proscribes school recognition of plaintiffs' club, we find it unnecessary to chart the limits and sweep of article IX, section 8's proscription.

poses." (At p. 605, fn. 12.) As we have explained, permitting the club to operate on campus implicates school authority and prestige behind the dissemination of religious dogma. This benefit cannot be viewed as "incidental to a primary public purpose." (12 Cal.3d at p. 605.) Indeed the primary purpose to be served by permitting the club to operate on campus as a student organization is to promote sectarian tenets, an intrinsically religious function. We are, therefore, compelled to conclude that the California Constitution will not suffer school officials to permit plaintiffs' Bible study club to meet and conduct its activities on school campus during the school day.

Plaintiffs argue that refusal to permit their club to operate on the campus on the same footing as other student clubs infringes upon rights guaranteed to them under the First and Fourteenth Amendments of the United States Constitution. The argument must be rejected. ██ The free exercise clause of the federal Constitution embodies two rights: Freedom to believe and freedom to act. "The first is absolute but, in the nature of things, the second cannot be." (*Cantwell* v. *Connecticut,* 310 U.S. 296, 303-304 [84 L.Ed. 1213, 1217-1218, 60 S.Ct. 900].) Under the free exercise clause, freedom of conscience and freedom to adhere to such religious organizations or beliefs as the individual may choose is secured against governmental interference. *(Cantwell* v. *Connecticut, supra.)* This is not to say, however, that religion may be exercised wherever and whenever the adherent chooses. (*Wisconsin* v. *Yoder,* 406 U.S. 205 [32 L.Ed.2d 15, 92 S.Ct. 1526]; *Poulos* v. *New Hampshire,* 345 U.S. 395, 405 [97 L.Ed. 1105, 1113-1114, 73 S.Ct. 760]; *Cantwell* v. *Connecticut, supra,* 310 U.S. 296.) The inevitable consequence of the establishment clause when applied to religious ritual on school property[17] is to restrict that activity to preserve the wall between church and

[17]Plaintiffs' reliance upon *Saia* v. *New York,* 334 U.S. 558 [92 L.Ed. 1574, 68 S.Ct. 1148]; *Kunz* v. *New York,* 340 U.S. 290 [95 L.Ed. 280, 71 S.Ct. 312], and *Niemotko* v. *Maryland,* 340 U.S. 268 [95 L.Ed. 267, 71 S.Ct. 325], which sanctioned the use of public parks as a forum for religious teaching is misplaced. The public school is organized " 'on the premise that secular education can be isolated from all religious teaching so that the school can inculcate all needed temporal knowledge and also maintain a strict and lofty neutrality as to religion.' " (*Abington School Dist.* v. *Schempp, supra,* 374 U.S. 203, 218 [10 L.Ed.2d 844, 856], quoting *Everson* v. *Board of Education, supra,* 330 U.S. 1, 23-24 [91 L.Ed. 711, 727] [Jackson, J. dissenting].) Justice Stewart in his dissent in *Schempp* also noted the unique circumstances of religious exercise on school property: "Our decisions make clear that there is no constitutional bar to the use of government property for religious purposes. On the contrary, this Court has consistently held that the discriminatory barring of religious groups from public property is itself a violation of First and Fourteenth Amendment guarantees. [Citations.] A different standard has been applied to public school property, because of the coercive effect which the use by religious sects of a compulsory school system would necessarily have upon the children involved. [Cita-

state. ■ " 'Our constitutional policy . . . does not deny the value or the necessity for religious training, teaching or observance. Rather it secures their free exercise. But to that end it does deny that the state can undertake or sustain them in any form or degree. For this reason the sphere of religious activity, as distinguished from the secular intellectual liberties, has been given the two fold protection and, as the state cannot forbid, neither can it perform or aid in performing the religious function. The dual prohibition makes that function altogether private.' " (*Abington School Dist.* v. *Schempp, supra,* 374 U.S. 203, 218-219 [10 L.Ed.2d 844, 856], quoting *Everson* v. *Board of Education, supra,* 330 U.S. 1, 52 [91 L.Ed 711, 742] [Rutledge, J. dissenting].)

■ This is not a case where plaintiffs are denied access to all public forums for religious expression; they are merely being denied use of school property during the school day for religious purposes. This deprivation in no way infringes upon their religious rights when practiced outside the confines of the school. Plaintiffs are only being denied religious expression in a manner involving state participation. Each club member remains free to believe and express his religious beliefs on an individual basis and the students' Bible study club is free to meet as such off campus outside of school hours. There is no infringement of plaintiffs' free exercise rights except to the limited extent made necessary by the establishment clause of the state and federal Constitutions.[18]

Judgment is affirmed.

Gardner, P. J., concurred.

**McDANIEL, J.**—I dissent.

Before setting down the reasons for my disagreement with the majority, I respectfully note that it is necessary to amplify the recitation of facts which brought this litigation before us.

---

tion.]" (*Abington School Dist.* v. *Schempp, supra,* 374 U.S. at p. 314 [10 L.Ed.2d at p. 910].) It cannot be said, therefore, that the power of the state to sanction religious practice on its property applies with equal force to all governmental property, irrespective of the nature of the property and governmental involvement resulting from such use.

[18]For cases in other jurisdictions holding that the free exercise clause is not violated by denying religious adherents use of school property, see: *Stein* v. *Oshinsky* (2d Cir. 1965) 348 F.2d 999, 1001-1002 [cert. den., 382 U.S. 957 (15 L.Ed.2d 361, 86 S.Ct. 435)]; *Hunt* v. *Board of Education of County of Kanawha* (S.D.W.Va. 1971) *supra,* 321 F.Supp. 1263, 1265-1266.

The proceedings in the trial court were based upon an agreed statement of facts tendered over the stipulation of counsel. Paragraph 18 of that stipulation stated: "The District's Board of Trustees has never issued to the individual schools any written instructions, guidelines or other writing purporting to define, describe or set forth any criteria as to what is meant by a club being 'sponsored' by an individual school as the word 'sponsored' is used in the provision of Board Policy No. 5144 that 'Clubs recognized by the board of trustees are those which are sponsored by the individual schools of the district.' Neither has the District issued any such written instructions, guidelines or other writing with the exceptions of Board Policy No. 5144 itself (Exhibit A to this Stipulation) and Staff Rule No. 5144 (Exhibit B to this Stipulation)."[1]

Paragraph 19 of that stipulation stated: "Except as set forth in paragraph 20, below, there is no manner in which groups of students at a high school in the Huntington Beach Union High School District can regularly have use of rooms or other space at such high school apart from applying for recognition as a student club."

Paragraph 20 of that stipulation stated: "A student or other members of the community may apply through the Civic Center Act[2] for use of school facilities as prescribed by law. The rules of the District respecting applications for use of school facilities under the Civic Center Act are attached hereto as Exhibit G and by this reference are made a part hereof."

Paragraph 21 of that stipulation stated: "The District would not grant an application made under the Civic Center Act by a group of students if the application requested use of rooms or other meeting space at a high school, if the purpose of the meeting was to enable the participating students to prayerfully study the Bible for the intended purpose of

---

[1] Board Policy No. 5144 and Staff Rule No. 5144 are quoted in the majority opinion.

[2] The Civic Center Act refers to section 16556 of the Education Code which reads: "There is a civic center at each and every public school building and grounds within the state where the citizens, parent-teachers' association, Camp Fire Girls, Boy Scout troops, farmers' organizations, school-community advisory councils, senior citizens' organizations, clubs, and associations formed for recreational, educational, political, economic, artistic, or moral activities of the public school districts may engage in supervised recreational activities, and where they may meet and discuss, from time to time, as they may desire, any subjects and questions which in their judgment appertain to the educational, political, economic, artistic, and moral interests of the citizens of the communities in which they reside. Governing boards of the school districts may authorize the use, by such citizens and organizations of any other properties under their control, for supervised recreational activities."

knowing God better so that they will be better persons, and if the meeting was proposed to be held at any time during the school day (i.e., at any time between the time that students are first required to report their attendance in the morning until the last class is dismissed in the afternoon)."

From a reading of Paragraph 18 of the stipulation, it can be fairly observed that the statement of the majority that "the consequence of permitting the club to operate on campus as a recognized student organization is to place school support and sponsorship behind the religious objectives of the club" is not necessarily dictated by the facts. Similarly, it is not the necessary result of the stipulated facts that "[t]he school permission sought by plaintiffs would meld the secular with the sectarian and would empower the Bible study club members to use the prestige and authority of the school in proselytizing their beliefs among students whose presence on the campus is compelled by law and who may be vulnerable to the pressure of an officially recognized student religious organization." To state that club members would use the prestige and authority of the school in proselytizing their beliefs exceeds the stipulation of facts, and, as speculation, is not the inevitable result to be expected if the plaintiffs' club were allowed to meet on the school premises.

The purpose for expanding the factual predicate, as disclosed by the record, beyond that upon which the majority opinion is based is to question, if recognition sought were granted, whether there would be "secular authority . . . behind the dissemination of religious tenets." Putting it plainly, how can the court presume to announce the factual consequences of what "recognition" and "sponsor" mean when the defendant school district has not itself done so during the approximately 15 years that the policy and rule have been in effect?

For instance, it could just as logically be argued that the factual purpose for having a "sponsor" present would be for disciplinary and safety reasons and for other aspects of pupil citizenship such as are implied in Board Policy No. 5144 where it is indicated that "[c]lubs shall be *responsible* to the school through which they are organized." (Italics added.)

Otherwise, before turning to a discussion of the legal precepts invoked by the majority, it is also significant to pay heed to the limitations upon

the free expressions of the plaintiffs represented by the circumstances disclosed in paragraphs 19, 20, and 21 of the agreed statement of facts. The net result of the circumstances there recited, coupled with the present refusal to recognize the plaintiffs' club, is that there is no way whatsoever that plaintiffs can gather during school hours on school property to give verbal expression to their religious views and beliefs. This proscription applies under the majority view, notwithstanding that other groups of students gathering together on school property during school hours, do have their rights recognized under the free expression clause of the First Amendment, United States Constitution, provided their subject of discourse is recreational, educational, political, economic, artistic, moral, or even agnostic. (See Ed. Code, § 16556.)

Proceeding from this addendum to the factual statement of the majority, and in terms of marshaling the precedents, there are two grounds, equally and independently valid in my view, on which I venture to dispute the majority result. The first is that the establishment clause, First Amendment, United States Constitution *does not* forbid the granting of the recognition plaintiffs here seek for their club. The second, assuming that the establishment clause *is* involved, is that, to the extent that any harm may be perceived in the recognition sought, such harm is far outweighed by the need to preserve and protect for the plaintiffs their rights of free expression and equal protection of the laws. These rights are now denied them in my view by reason of the refusal of recognition coupled with the circumstances described in paragraphs 19, 20, and 21.

Turning then to a discussion of the first technical ground for dissent, I respectfully suggest, on the facts before us, that the so-called recognition of their club which the plaintiffs seek would not, if granted, transgress upon what is proscribed by the establishment clause.[3] Proceeding with an orthodox effort to affirm the correctness of this proposition in the light of precedent, it must be conceded by the majority that there are only four latter-day opinions delivered by the United States Supreme Court dealing directly with religious activities of public school pupils during school hours. In three of these four opinions it was ruled that public schools cannot *sponsor* religious activities, and it requires only a cursory look at the facts of those cases to gain an insight into what was meant by

---

[3]As a practical matter, one wonders why the school authorities did not leave well enough alone and continue with their policy begun on January 8, 1974. No one was objecting; there was no outcry from the community. What appeared to be reasonable to both the administration and the students was thwarted by the fateful opinion of the county counsel which spawned this litigation.

the use of the term *sponsor.* Certainly, it was nothing even remotely akin to the "sponsorship" sought by the plaintiffs for their club.

In *McCollum* v. *Board of Education,* 333 U.S. 203 [92 L.Ed. 649, 68 S.Ct. 461], a school board *affirmatively required* 30-minute, religious-instruction periods to be held each week in the classrooms, using outside religious instructors under the control of the superintendent of schools. Participation was voluntary, but those not wishing to join in were required to go elsewhere in the building for some sort of secular instruction. Surely, such requirement can be readily characterized as directly athwart the establishment clause as now interpreted.

In *Engel* v. *Vitale,* 370 U.S. 421 [8 L.Ed.2d 601, 82 S.Ct. 1261], the rules of the school board *affirmatively required* daily morning ceremonies in the classroom. These ceremonies took the form of a "denominational-ly" neutral prayer read word for word as composed by some state official or agency. This too was obviously violative of the rule against the state establishment of religion.

In *Abington School Dist.* v. *Schempp,* 374 U.S. 203, [10 L.Ed.2d 844, 83 S.Ct. 1560], it was the state which *affirmatively required* daily reading in class from the Bible followed by the recitation of the Lord's Prayer. Student participation was voluntary, but the ritual was compulsory. Such a requirement was also found to be within the prohibition of the establishment clause.

However, the fourth of the group of cases noted is readily distinguish-able from the other three. It is from this distinction that we can deduce the meaning of the word "sponsor" as used in this type of case. In *Zorach* v. *Clauson,* 343 U.S. 306 [96 L.Ed. 954, 72 S.Ct. 679], there was a weekly arrangement similar to that obtaining in *McCollum.* The difference, however, was that the weekly religious instruction was not held in the classroom and the instructors were not under the control of the school superintendent. The *accommodation* of such activity was held to be constitutionally permissible.

One might tend to see the distinction of *Zorach* from the other three as arising from the physical location of the religious activity and therefore condemn the activity for which plaintiffs seek sanction because it is intended to be conducted on school property. However, no such mechanistic simplicity is at the heart of the distinction. In the course of

the opinion in *Zorach* the majority stated that the ground for outlawing the activity in *McCollum* was that the use of the classrooms for religious instruction meant that the "force of the public school was used to promote that instruction." (*Zorach* v. *Clauson, supra,* 343 U.S. 306, 315 [96 L.Ed. 954, 962].) From this it can be seen that it was the combination of classroom and mandatory instruction which was held to be constitutionally impermissible, the implication being, if *accommodation* only was involved, that religious activity could permissibly occur on the school grounds.

That this was the true basis for the distinction between *Zorach* and the other three cases can be traced in a series of lower court cases. In *Reed* v. *Van Hoven,* 237 F.Supp. 48, 53, a federal district court upheld a truly voluntary on-campus prayer program which did not appear to have the imprimatur of the school. In *Lawrence* v. *Buchmueller,* 40 Misc.2d 300 [243 N.Y.S.2d 87], a New York court found no establishment clause violation in a creche being allowed on school property under circumstances where "[u]nlike *Engel* . . . or . . . *Schempp* . . . which concerned active involvement by Government in religious exercises, the present case constitutes, at most, merely a passive accommodation of religion. . . ." (*Id.,* at pp. 90-91.) In *Wood* v. *Mt. Lebanon Township School District,* 342 F.Supp. 1293, a federal district court found no establishment clause violation in allowing invocational and benedictional prayers to be said in on-campus graduation ceremonies where there was no "semblance of governmental establishment or even condonation." (*Id.,* at p. 1295.)

The fact that the physical place of the religious activity is not the controlling factor was inversely confirmed in *Moore* v. *Board of Education,* 4 Ohio Misc. 257 [33 Ohio Ops.2d 406, 212 N.E.2d 833], where an Ohio court would *not* countenance a release-time program *off* the school campus where the facts indicated that, in the contemplation of the pupils, it looked like the school was conducting the religious instruction. From this analysis it then can be conscientiously urged that it is a permissible governmental or state posture to accommodate the religious interests of school pupils on the school premises. Taking it a step further, in *Stacy* v. *Williams,* 306 F.Supp. 963, a three-judge federal court held *invalid* (on equal protection grounds) a University of Mississippi regulation which singled-out and forbade on-campus religious meetings; pointing out that the University's approval of any activity can easily be negated by merely announcing at the time that the university did not necessarily subscribe to its content. (*Id.,* at p. 974.)

To afford guidance to a determination of just where one finds legal accommodation as contrasted to illegal sponsorship, the United States Supreme Court in *Lemon* v. *Kurtzman,* 403 U.S. 602 [29 L.Ed.2d 745, 91 S.Ct. 2105], laid down a three-pronged test by which to measure the statute in question or, as here, the non-statutory state action represented by the school district's "recognition" of plaintiffs' club. To quote from *Lemon,* "[f]irst, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion [citation]; finally, the statute must not foster 'an excessive government entanglement with religion.' [Citation.]" (*Id.,* at pp. 612-613 [29 L.Ed.2d at p. 755].)

Measuring the proposed district action against the three criteria, both sides agree that the recognition procedure has a secular purpose. Proceeding to the second point, the majority reached the conclusion that the primary effect of recognition would be that "[t]he Bible study club would implicitly become an integral part of the school's extracurricular program conducted during the school day when students are compelled by law to attend the school." I respectfully point out that they reached this conclusion as a result of their misconception of what "sponsorship" by the school actually entailed. Without explaining just how it would come about, the majority seems to take it for granted that the few simple procedures recited by Board Policy No. 5144 and Staff Rule No. 5144 would have a "primary effect" of advancing religion. Such view is implicit when they state that "[t]he 'primary effect' test bespeaks not only of financial assistance[4] but also necessarily inquires whether the consequence of state action is to place its imprimatur upon the religious activity. [Citations.]" In effect, the majority have said it is impermissible because it is impermissible. They make no serious attempt to inquire into whether the activity in question might be accommodation under the *Zorach* concept as distinguished from sponsorship under *McCollum, Engel* and *Abington,* where sponsorship was tantamount to affirmatively requiring the activity which was stricken down.

As a consequence of the underlying basis for the distinction noted between *Zorach* and the other cases, I suggest on the facts of the stipulation that it would be more logical to characterize what is sought here by plaintiffs as accommodation. On the facts, the defendant school district, for more than 15 years, has not defined factually what it means to recognize these clubs. In addition, in January of 1974, it took action to

---

[4]The free use of a classroom and the availability of heat and light.

allow the plaintiffs to proceed informally with their religious activities. From this I perceive that there was nothing anticipated by the nonlawyers then involved, or by the other students, or by the parents of other students which would cause any commotion. The "recognition" sought here on the face of it was and is both peripheral and innocuous in terms of the school district's involvement. Actually, in practical result, it is very little different from what was countenanced by the order of January 8, 1974, before arrival of the legal opinion of the county counsel which I suspect no one welcomed. Anyway, perhaps this effort to argue by deduction is flaying the obvious, but it seems to me that when a factual question is as close as this one is, there is surely merit in giving some weight to the nonlegal objectives initially found acceptable by the parties on both sides.

In sum, therefore, reviewing the facts as contained in paragraph 18 of the stipulation and noting the contents of Board Policy No. 5144 and Staff Rule No. 5144, I would hold that the recognition here sought by the plaintiffs would result only in an *accommodation* of the religious views and activities of the plaintiffs as permitted under *Zorach* v. *Clauson, supra,* 343 U.S. 306, and would not be impermissible *sponsorship* which I construe under the cases to mean affirmatively to require the religious activity challenged.

As a postscript to this portion of the dissent, I must respectfully observe that the kind of "divisiveness" which the majority foresees here has only been noted in those cases where the religious activity has been in some manner required. It is logically difficult to imagine how a completely voluntary program could be divisive.

The second ground on which I dissent from the result reached by the majority invokes the rights of plaintiffs under the free expression clause, First Amendment, as well as the equal protection clause, Fourteenth Amendment, United States Constitution. This calls up for notice three comparatively recent decisions of the United States Supreme Court. *Tinker* v. *Des Moines School Dist.,* 393 U.S. 503 [21 L.Ed.2d 731, 89 S.Ct. 733], holds that the rights to free expression guaranteed by the First Amendment are not shed by students when they cross the thresholds of the public schools. *Healy* v. *James,* 408 U.S. 169 [33 L.Ed.2d 266, 92 S.Ct. 2338], held that public schools which maintain an ongoing program of recognizing student organizations that includes allowing student groups so recognized to use school facilities for meetings (cf. Board Policy No.

5144 and Staff Rule No. 5144) cannot deny such recognition and the use of school facilities on the basis of the subject of the proposed student activities. *Police Department of Chicago* v. *Mosley,* 408 U.S. 92 [33 L.Ed.2d 212, 92 S.Ct. 2286], extended the concept announced in *Healy,* decided the same day, and held that the government may not establish a public forum for the communication of ideas and then deny access to that forum on the basis of what is to be said.

In the light of these precedents, it can be logically urged that a public school district which recognizes student clubs and allows them the use of school facilities for meetings and communication purposes may not single out those student groups with religious interests and solely on that basis deny to those groups recognition where the result also is to deny them the use of meeting rooms and communication facilities equivalent to those granted to other student groups.

While *Healy* involved the efforts of the Students for a Democratic Society (SDS) to secure a forum at a Connecticut State College, and while *Mosley* involved the action by a solitary postal employee in picketing a school and carrying a sign accusing it of racist policies which led to his conviction under a Chicago ordinance which forbade picketing of schools *except in labor disputes,* the decision in *Tinker* on its facts comes close to what is involved in the case at bench.

In *Tinker* the school sought to expel certain of its students who, in violation of a school regulation, wore black armbands on the school campus to express their disapproval of the Vietnam War. The students sought an injunction against enforcement of the regulation, and their complaint was dismissed by the United States District Court. The Court of Appeals, Eighth Circuit, affirmed without opinion. The United States Supreme Court reversed, and where there was an absence of any determination of facts which might reasonably have led school authorities to foresee substantial disruption of the school's operations, observed, "[c]learly, the prohibition of expression of one particular opinion, at least without evidence that it is necessary to avoid material and substantial interference with schoolwork or discipline, is not constitutionally permissible. . . . Students in school as well as out of school are 'persons' under our Constitution. They are possessed of fundamental rights which the State must respect, just as they themselves must respect their obligations to the State. . . . The principal use to which the schools are dedicated is to accommodate students during prescribed hours for the purpose of

certain types of activities. *Among those activities is personal intercommu-nication among the students.*" (*Tinker* v. *Des Moines School Dist., supra,* 393 U.S. 503, 511, 512 [21 L.Ed.2d 731, 740-741]; italics added.)

Similarly, in *Garvin* v. *Rosenau,* 455 F.2d 233, the Court of Appeals, Sixth Circuit, reversed the United States District Court which had dismissed the plaintiffs' complaint arising from a refusal of a public school to recognize a chapter of the Student Mobilization Committee on the ground that it violated a school policy against student clubs which adhered to partisan points of view. This was in a context similar to that prevailing at Huntington Beach in that the school maintained an ongoing program of recognizing student clubs.

In the case now before us, the defendant district has itself determined that an ongoing program of student organizations is an appropriate forum for the discussion of ideas at its school. It cannot now deny that forum to plaintiffs on the basis of the subject matter of the ideas to be discussed. Had it not created that forum, plaintiffs would have no claim to use public property for Bible study purposes. (Cf. *Hunt* v. *Board of Education of County of Kanawha,* 321 F.Supp. 1263, in which student prayer not connected with an ongoing student club program or any other school-established forum was held by a federal judge not to be privileged.) But the district has created an ongoing student club program, and the cases cited clearly show that these plaintiffs may not be excluded from the forum thus created unless, of course, the First Amendment which includes a guarantee of religious liberty is somehow construed so that religion is the one subject not protected by the freedom of a public forum.

The liberties of expression and association, the freedom of a public forum, and the right to the equal protection of the laws are in a sense all of a single fabric which is the fabric of free and equal communication involving the right to *receive* communication as well as the right to *impart* communication. This right of communication has a value to weigh on the scales against whatever establishment clause value is involved in allowing these students to use an empty school room for Bible discussion purposes just as other students are allowed to use other empty rooms for secular discussion purposes.

What is the value of these communication rights? It might be argued that to deny these students the privilege of studying the Bible during

lunch hour does not completely destroy their right to communicate. It only eliminates one subject matter, leaving communication perfectly open on all other subjects. Thus, the argument goes, there is not *really* much of an infringement upon communication. A not dissimilar argument was made in *Thomas* v. *Collins,* 323 U.S. 516 [89 L.Ed. 430, 65 S.Ct. 315], wherein a national labor union officer was held in contempt of an ex parte restraining order enjoining him from soliciting union members without first registering with the state. It was argued that it was a small thing to ask him to register. The court replied, "[t]he restraint is not small when it is considered what was restrained" and held that in weighing the value of First Amendment freedoms against the right of a state to exercise the police power, "it is the character of the right, not of the limitation" which is placed upon the scales of justice. (*Id.,* at pp. 543, 530 [89 L.Ed. at pp. 447, 440].)

To conclude this portion of my dissent, I can do no better than to defer to the comments of counsel for the plaintiffs who observes, "[t]he practical realities are that if students are to communicate with students on any subject they must do so where students come together: at school! [¶] On one side of the scale is an empty school room. Being empty, it would hardly move the scale even if it were being balanced against nothing, especially since there is no governmental purpose other than to be fair, grant equality and given an opportunity for student intercommunication. On the students' side of the scale there is to be weighed almost every one of the freedoms that are most valued by our nation's fundamental laws."

Before proceeding to a more fundamental quarrel with the constitutional authorities relied upon by the majority, it is necessary to dispose of the possibility that the recognition here sought would run afoul of the California Constitution. Without attempting to weave an argument that the provisions of the California Constitution, if deemed to forbid what is sought, would be void under the United States Constitution, a good case can be made that the activity which plaintiffs want recognized is not prohibited by the California Constitution.

Article XVI, section 5 of the California Constitution, formerly article XIII, section 24,[5] provides in pertinent part, "Neither the Legislature, nor any county, . . . or other municipal corporation, shall ever make an

---

[5] Article XIII, section 24, formerly article IV, section 30, which prohibited appropriation of public funds in aid of religious purposes or institutions, was repealed November 5, 1974. Article XVI, section 5 was added to the Constitution on the same day.

·appropriation, or pay from any public fund whatever, or grant anything to or in aid of any religious sect, church, creed, or sectarian purpose . . . ." This section has been characterized by the Attorney General of California as "the definitive statement of the principle of government impartiality in the field of religion." (37 Ops.Cal.Atty.Gen. 105, 107.) It has been held under this section, that even if a statute has some identifiable secular objective, such fact will not immunize· it from analysis to determine whether it also has the direct, immediate, and substantial effect of advancing religion. (*Frohliger* v. *Richardson*, 63 Cal.App. 209, 217 [218 P. 497].) In *Frohliger*, the court struck down a statute appropriating money for the restoration of the San Diego Mission although it concluded that secular (i.e., historical and cultural objectives), as well as religious ends, were aided by the statute.

However, this "section has never been interpreted . . . to require governmental hostility to religion, nor to prohibit a religious institution from receiving an indirect, remote, and incidental benefit from a statute which has a secular primary purpose. [Citation.]" (*California Educational Facilities Authority* v. *Priest*, 12 Cal.3d 593, 605 [116 Cal.Rptr. 361, 526 P.2d 513].)

In the case just cited, the state treasurer declined to proceed with the steps necessary to sell certain bonds authorized by the Educational Facilities Authority Act. (Ed. Code, § 30301 et seq.) Her reason for doing so was because questions had been raised concerning the constitutionality of the act under then article XIII, section 24. The "Authority," along with the University of the Pacific, sought a writ of mandate to compel the treasurer to proceed as called for by the act. The Supreme Court issued the writ, holding that the act neither violated the establishment clause of the First Amendment of the United States Constitution, nor the state constitutional proscription already noted.

In the course of the opinion, Justice Mosk states "[t]he benefits of the Act are available to all nonpublic institutions of higher education in the state, whether sectarian or nonsectarian." (*Id.*, at p. 601.) Invoking *Hunt* v. *McNair*, 413 U.S. 734 [37 L.Ed.2d 923, 93 S.Ct. 2868] Justice Mosk continues, ". . . in evaluating the 'primary effect' of the legislation in [the cited case], the court reiterated its prior rejection of the argument, also advanced by respondent here, that all governmental assistance to a sectarian organization is forbidden under the establishment clause 'because aid to one aspect of an institution frees it to spend its other resources on religious ends.' [Citation.] Rather, a state may constitution-

ally 'provide church-related schools with secular, neutral, or nonideological services, facilities, or materials.' (*Lemon* v. *Kurtzman* (1971) . . . 403 U.S. 602, 616 [29 L.Ed.2d 745 757-758].)" (*California Educational Facilities Authority* v. *Priest, supra,* 12 Cal.3d 593, 601.)

Accordingly, if the state can permissibly lend the massive power of its treasurer in aid of a sectarian institution to help finance the construction of educational facilities, it seems that to allow a group of high school students to use school rooms to discuss the Bible is well within the rule quoted. As stated further by Justice Mosk, "[t]here can be no claim in the instant case that the proposed project runs afoul of this test. As noted, the University of the Pacific is not affiliated with any religious organization. *But even if it were, neither the Act nor the proposed project would have the impermissible primary effect of advancing religion.*" (*Id.,* at p. 601; italics added.)

So it can be observed here. Surely, to allow the plaintiffs to sit in a classroom at Edison High School and discuss the Bible in the presence of a faculty member, present to keep order if needed, cannot seriously be regarded as importing an action by the district to "grant anything to or in aid of any religious sect . . . ." (Cal. Const., art. XVI, § 5.)

It remains to give vent to what has increasingly troubled me about the trend of the decisions purporting to construe and apply the establishment clause. It is certainly not because of any arrogant delusions of Delphic prescience that I voice the lament which follows, but rather because I have long been awaiting this chance to express a deep concern which hopefully will fall upon interested ears and then be equally shared. What follows is a plea similar to that made by those valiant and persistent heroes[6] of almost 25 years ago, a plea which led to their triumph in *Brown* v. *Board of Education,* 347 U.S. 483 [98 L.Ed. 873, 74 S.Ct. 686, 38 A.L.R.2d 1180]. By that I mean to imply that constitutional pronouncements have no claim to immortality. Times change and previously obscured wisdom emerges. In *Brown,* the United States Supreme Court was finally persuaded by essentially sociological and psychological wisdom which had at last gained widespread acceptance among our citizenry that the "separate but equal" facilities doctrine as applied to schools for children of minority birth was untenable against the admonition of the Fourteenth Amendment that all persons shall enjoy equal protection of the laws.

---

[6]See Kluger, Simple Justice (1976).

In an analogous mode, I see the necessity for a re-evaluation of the cases construing the establishment clause. With due respect for the sincerity of those who have authored the cases relied upon by the majority, it seems to me that their sweeping interpretations of the simple phrase that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. . . ." (U.S. Const., Amend. I) have distorted all out of rational proportion both what the framers of the Constitution intended and what is fundamental to the survival of an ethical society. To give meaning and substance to this call for a change in the trend of the cases, I have chosen to quote extensively from an essay written by Frank Goble[7] for dissemination by the Thomas Jefferson Research Center of Pasadena, California.[8]

The essay, as a kind of text to build on, sets forth the following thought: "When a society is perishing, the true advice to give to those who would restore it is to recall it to the principles from which it sprung." Mr. Goble then proceeds.

"Russell Kirk is the author of a magnificent volume entitled 'The Roots of American Order.' It ought to be required reading in our schools and for everyone concerned about our society. The book traces the ideas from Egypt, Greece, Italy (Rome), Europe and other nations that became, in the creative minds of the Founding Fathers, the basis for the most successful society in history.

" 'Upon the classical and theological virtues,' writes Dr. Kirk, 'upon the social experience of the old world and the new, there was built by self-sacrifice and high imagination the intricate structure of personal and public order. Although no single human mind planned this order of ours, the wisdom and the toil of countless men and women have gone into its making.'

"It seems obvious [despite this] that something is seriously wrong. . . [A]t a time when we are spending more than ever on education, we see

---

[7] I do not know Mr. Goble, but I have heard him speak. My reason for choosing Mr. Goble's essay is that anyone would be hard pressed to improve upon his exposition of the points he makes which are the points I wish to make. The essay is not quoted in its entirety, but has been edited without sacrificing its thrust.

[8] The Thomas Jefferson Research Center is a nonprofit corporation organized in 1963 for multi-disciplinary applied human research. The organizers were concerned over an increase in social problems and have sought to determine if the problem-solving methods of professional management could be successfully applied to the solution of human problems.

proliferating strikes by teachers, increasing violence and vandalism, and high school 'graduates' who are functionally illiterate. [O]n every level, our society is witnessing an alarming increase in irresponsible behavior.

"Systems, social or mechanical, function when the various parts are in order. Your auto mechanic, if he is a good one, knows why your car works. He has a mental image of a well-functioning automobile. But when your car doesn't operate, you don't want the mechanic to tell you about a well-functioning car, you want him to find out what's wrong and repair it.

"The same reasoning can be applied to our society. We need to understand the fundamental ideas that made our society great—Dr. Kirk has given us an excellent explanation of this. Then, if we are to recover our greatness, we must identify what has gone wrong and correct it. Thus, the urgent question becomes, what are the roots of American Disorder? WHAT IS WRONG?

". . . It is our opinion . . . that a basic cause for our society's exploding problems is personal and organizational irresponsibility. Irresponsibility is a social disease that, if left untreated, destroys individuals, families, communities, and nations. The world is littered with the ruins of societies destroyed by irresponsibility. . . .

"What causes irresponsible human behavior? Moral ignorance! Why is moral ignorance increasing in a society which is spending more for education each year and more on education as a percentage of its total production than any other society in history? Walter Lippmann explained it quite succinctly years ago when he said, 'During the past 40 or 50 years, those who are responsible for education have progressively removed from the curriculum of studies, the Western culture which produced the modern democratic state. The schools and colleges have, therefore, been sending out into the world, men who no longer understand the creative principles of the society in which they must live. The prevailing education is destined, if it continues, to destroy Western civilization and is, in fact, destroying it.'

"There is more than enough evidence to prove that American education at all levels has indeed placed less and less emphasis on the cultural principles that provided the foundation for our national success. Dr. Benjamin D. Wood, former Director of the Bureau of Collegiate Education Research at Columbia University described it as, 'The

lamentable disengagement of American education from its indispensable role in the moral, ethical realm which arose from a grieviously erroneous interpretation of the wise separation of church and state, which error in turn grew out of an older and unfortunately still widely-accepted error of confusing morality and ethics with one or another specific ecclesiastical affiliations.' . . .

"John Nietz did a study of old textbooks and found that originally moral education was one of the principal objectives of our schools. According to Mr. Nietz, before 1775, religion and morals accounted for over 90 percent of the content of school readers. By 1926, this was down to 6 percent, and it is doubtless far less today, perhaps too small to be measured.

"Mr. Nietz says that to understand the decline of moral values and the rise in vandalism and crime we need only to contrast the content of the McGuffey readers (first published in 1836-57) with the 'literature' inflicted on children today.

"Mr. Nietz says about the McGuffey readers: 'Such moral qualities as honesty, truth and truthfulness, obedience, temperance, kindness to humans and animals, thrift, work and patriotism were largely taught by means of actual human and situational stories.. . . It has been recognized by students of history that the lessons in the McGuffey readers did much to set the standards of morality and of the social life in the pioneering West for more than half a century. Many of the truths and poetic expressions memorized from these readers were quoted by parents, preachers and others to counter acts of intemperance, vulgarity, laziness, brutality, dishonesty and lawlessness, which were altogether too common among frontier people. . . Many distinguished Americans who were reared west of the Appalachians . . . have acknowledged the deep debt they owe to the lessons learned from these readers.' . . .

"I could give many other examples to show that there has been a very substantial decline in educational emphasis on the moral and ethical concepts that provided the basis for American order. Educators have not merely de-emphasized our cultural heritage, in many cases they have taught that it is obsolete—some suggest that it was never valid. . . .

"If moral principles form the roots for American order, then moral relativism (the denial of moral principles) must form the roots of disorder. If this is the situation, how did it occur? How and why did our

educational system shift from an emphasis on moral principles to an avoidance or even denial of principles? (In defense of our educational system it should be pointed out that most Americans have permitted, or at least have not often objected to, this trend.)

"The answer, I am convinced, lies in an understanding of the behavioral sciences and their steadily increasing influence since about 1870. Dr. Willis Harman, former Director of one of the U.S. Office of Education's Educational Policy Research Centers, concurs. 'The religious tenets which form the undergirding of the values of the society,' he states, 'as well as for the overarching national purpose, reeled under the successive blows of the paleontologists, the evolutionists, psychoanalysts, and the positivistic behavioral scientists. By a half century ago or so they had been eroded away to such an extent that the society's value structure was, as it were, left hanging without support.'

"Abraham Maslow identified the behavioral sciences as playing a major role—perhaps the major role—in causing the declining emphasis on moral principles and individual responsibility in our schools.

" 'The ultimate disease of our time is valuelessness,' he stated, '. . . this state is more crucially dangerous than ever before in history . . . It becomes more and more clear that the study of crippled, stunted, immature, and unhealthy specimens can yield only a crippled psychology and a crippled philosophy. The study of self-actualizing people must be the basis for a more universal science of psychology.' . . .

"A society cannot continue to exist without a workable system of values. 'Moral decay,' writes Charles Brough, in The Cycle of Civilization, 'has generally been a characteristic facet of every declining civilization.'

"One of the most widely read history books of all times is The Decline and Fall of the Roman Empire written in 1788 by Edward Gibbons. He set forth five basic reasons why that great civilization withered and died. These were:

"The undermining of the dignity and sanctity of the home which is the basis for human society.

"Higher and higher taxes; the spending of public money for free bread and circuses for the populace.

"The mad craze for pleasure; sports becoming every year more exciting, more brutal, more immoral.

"The building of great armaments when the real enemy was within—the decay of individual responsibility.

"The decay of religion; faith fading into mere form, losing touch with life, losing power to guide the people.

" 'In studying the breakdowns of civilizations,' states Arnold Toynbee, 'we found that the cause was, in every case, some failure of self-determination, and that, when human beings thus lost control over their own destinies, this social disaster usually turned out to have been the consequence of a moral aberration.' At another time Toynbee wrote, 'I do not believe that civilizations are fated to break down, or that they have a fixed maximum life span . . . I do not believe either that civilizations break down through being worsted by their environment. I believe that, when they do break down, the cause is, not some blow from outside, but some inward spiritual failure—some kind of demoralization to which we human beings are not bound to succumb and for which we ourselves therefore bear the responsibility. . . .'

"The roots of American disorder can be found in our institutions of education in the social and behavioral disciplines. The dominant theories here have been inconsistent with and sometimes antagonistic to our traditions and tend to discourage individual responsibility. . . ."

To what has been quoted, particularly, " '[t]he lamentable disengagement of American education from its indispensable role in the moral, ethical realm which arose from a *grieviously erroneous interpretation* [italics added] of the wise separation of church and state . . . grew out of an older and unfortunately still widely-accepted error of confusing morality and ethics with one or another specific ecclesiastical affiliations,' " I would add that the "lamentable disengagement" noted has been aided and abetted every step of the way by a persistent and increasingly portentous rhetoric in the decisions of the United States Supreme Court whose authors fail to perceive the difference on the one hand between the prohibitions against the establishment of a state religion (which *is* all of an affirmative nature that the establishment

clause was really ever intended to *prohibit*)[9] and on the other the countenancing of school teachers teaching theological, ethical, and moral concepts from all possible points of persuasion. What this has led to is a tyranny of the minority. The many teachers who share the views of Mr. Goble as above expressed are afraid to voice them, while those teachers who discount the moral and ethical foundations of our national heritage are free in the classroom to denounce that heritage with impunity.

Therefore, let there be a start on the road back, just as there was in *Brown* v. *Board of Education, supra,* 347 U.S. 483, in the field of school segregation. In this area, let there emerge a rule of constitutional decision which clearly supports the accommodation concept announced in *Zorach* v. *Clauson, supra,* 343 U.S. 306. Such a rule should also make it plain that locally formulated curricula recognizing and implementing the need for moral and ethical training of school pupils not only are permissible but are to be encouraged.[10]

I would reverse the judgment and direct the trial court to grant the relief prayed for.

A petition for a rehearing was denied March 30, 1977. McDaniel, J., was of the opinion that the petition should be granted.

---

[9]Actually, it seems that the latter portion of the admonition of the establishment clause has been wholly overlooked, i.e., where it says that "Congress shall make no law . . . prohibiting the free exercise [of religion]."

[10]Lest this tract be construed by anyone to be an artfully disguised effort to promote and advance the teachings of the Bible, let it be known that I am an ardent and practicing Buddhist and a member of the Nichiren Shoshu Soka Gakkai.