Melanie CENICEROS, a minor, By and Through her Guardian Ad Litem and Mother Rose RISSER; Rose Risser, Guardian Ad Litem and Mother of Melanie Rose Ceniceros, Plaintiffs–Appellants,

v.

BOARD OF TRUSTEES OF THE SAN DIEGO UNIFIED SCHOOL DISTRICT, Defendant–Appellee.

No. 94–55257.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 13, 1995.

Filed Sept. 28, 1995.

Withdrawn Feb. 6, 1997.

Decided Feb. 6, 1997.

**879**

Michael S. Paulsen, University of Minnesota Law School, Minneapolis, MN, and Gerald W. Hokstad, Hurst & Hokstad, Solana Beach, CA, The Rutherford Institute, for plaintiffs-appellants.

Jose A. Gonzales, San Diego Unified School District, San Diego, CA, for defendant-appellee.

Anthony J. Steinmeyer and Lowell V. Sturgill, Jr., United States Department of Justice, Washington, DC, for United States as amicus curiae.

Steven T. McFarland and Kimberlee Wood Colby, Center for Law & Religious Freedom, Annandale, VA, for Christian Legal Society, National Council of Churches of Christ, National Association of Evangelicals, and Christian Life Commission of the Southern Baptist Convention as amicus curiae.

* Hon. Donald P. Lay, Senior United States Circuit Judge for the Eighth Circuit Court of Appeals, sitting by designation.
1. Ceniceros has graduated from high school since the time this action was filed. Consequent-

Jay Alan Sekulow, American Center for Law and Justice, Virginia Beach, VA, for Student Coalition for Free Speech as amicus curiae.

Before LAY,* BRUNETTI and RYMER, Circuit Judges.

Opinion by Judge BRUNETTI; Dissent by Judge LAY.

### ORDER

The opinion filed July 13, 1995, is withdrawn.

### OPINION

BRUNETTI, Circuit Judge:

Melanie Rose Ceniceros sued the Board of Trustees of the San Diego School District (the District) seeking declaratory and injunctive relief and damages. Her complaint alleged that, by denying her religious club the opportunity to meet during lunch as other clubs were allowed to, her high school, University City High School (UCHS), violated her rights under the Equal Access Act (Act), 20 U.S.C. §§ 4071–74 (1990), and the Free Speech and Free Exercise Clauses of the Constitution. The parties brought cross-motions for summary judgment. The district court granted the District's motion and denied Ceniceros's. We have jurisdiction under 28 U.S.C. § 1291,[1] and we reverse.

### I.

University City High School is a public secondary school located in the San Diego Unified School District which receives federal financial assistance. Classroom instruction begins at 7:25 a.m. All students at UCHS have the same lunch period, from

ly, her claims for injunctive and declaratory relief are moot, and only her claim for monetary damages survives. *See Wilson v. State of Nevada,* 666 F.2d 378, 380–83 (9th Cir.1982)

11:30 a.m. to 12:10 p.m. daily, during which time they are free to leave the school campus. · No classes are held during lunch. Classroom instruction resumes at 12:15 p.m. and ends at 2:10 p.m.

In December 1992, Ceniceros, then a senior at UCHS, asked the vice-principal if she could form a student religious club that would meet in an empty classroom during the school lunch period. The vice-principal allowed the club's formation, but denied the request to use classrooms during the lunch period.

Several other voluntary, noncurriculum related student groups and clubs meet during the lunch period. These include the African American, African Friends, Hackey Sac, and Surf clubs, the California Scholarship Federation, the Movimiento Estudiantil Chicano Aztlan, and the Organization for Nature Conservation. It is unclear from the record whether these other groups meet in classrooms or at some other location on school premises.

Ceniceros filed the present action seeking declaratory and injunctive relief and damages for violation of the Act and her rights under the Free Speech and Free Exercise Clauses of the First Amendment. The parties brought cross-motions for summary judgment. The district court granted the District's motion on all counts, and denied Ceniceros'. Ceniceros timely appeals grant of the District's motion.[2]

## II.

All issues presented are issues of law reviewed de novo. *Tipton v. University of Hawaii,* 15 F.3d 922, 923 (9th Cir.1994).

## III.

■ The statutory issue in this case is whether UCHS' lunch hour is "noninstructional time" within the meaning of the Equal Access Act. The Act provides, in pertinent part:

It shall be unlawful for any public secondary school which receives Federal financial assistance and which has a limited open forum to deny equal access or a fair opportunity to, or discriminate against, any students who wish to conduct a meeting within that limited open forum on the basis of religion, political, philosophical, or other content of the speech at such meetings.

20 U.S.C. § 4071(a). A "limited open forum" exists "whenever [a] school grants an offering to or opportunity for one or more noncurriculum related student groups to meet on school premises during noninstructional time." 20 U.S.C. § 4071(b). The Act in turn defines noninstructional time as "time set aside by the school before actual classroom instruction begins or after classroom instruction ends." 20 U.S.C. § 4072(4).

The parties agree that: UCHS is a public secondary school receiving federal funding; other noncurricular clubs meet during lunch hour; and Ceniceros' noncurricular club possesses the characteristics that bring it within the Act's "safe harbor" provision, 20 U.S.C. § 4071(c). The District argues, however, that its denial of lunchtime access to Ceniceros did not violate the Act because UCHS' lunch hour does not fall within the Act's definition of "noninstructional time." We disagree.

The plain meaning of "noninstructional time," as defined in § 4072(4), includes the lunch period at UCHS. At UCHS, classroom instruction begins at 7:25 a.m. and ends at 11:30 a.m.; it resumes at 12:15 p.m. and continues until 2:10 p.m. The parties specifically stipulated that no classroom instruction occurs during the school's lunch hour. In fact, students are not even required to remain on campus during this time. Accordingly, we find that the school has "set aside" the lunch hour as non-classroom, noninstructional time, which occurs "after actual classroom instruction" ends for the morning session and "before actual classroom instruction begins" for the afternoon. Moreover, because the plain meaning of "noninstructional time" is unambiguous, we need not look to the Act's legislative history. *See Rumsey*

---

2. Ceniceros has not separately appealed, and therefore we do not address, the district court's denial of her motion for summary judgment.

*Indian Rancheria of Wintun Indians v. Wilson,* 41 F.3d 421, 427 (9th Cir.1994), *amended on denial of rehearing,* 64 F.3d 1250 (9th Cir.1995) (citing *United States v. Taylor,* 487 U.S. 326, 344–46, 108 S.Ct. 2413, 2423–25, 101 L.Ed.2d 297 (1988) (Scalia, J., concurring)).

Our straightforward reading of § 4072(4) is in accord with the purpose of the Equal Access Act, and the principles for interpreting it set forth by the Supreme Court in *Board of Education v. Mergens,* 496 U.S. 226, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990). In *Mergens,* the Court noted that the Act reflects "a broad legislative purpose," *id.* at 239, 110 S.Ct. at 2366, and repeatedly defined the purpose of the Act in broad terms. *See, e.g., id.* at 238, 110 S.Ct. at 2365 ("[T]he purpose of granting equal access is to prohibit discrimination between religious or political clubs on the one hand and other non-curriculum-related student groups on the other[.]"); *id.* at 241, 110 S.Ct. at 2367 ("... Congress clearly sought to prohibit schools from discriminating on the basis of the content of a student group's speech[.]"); *id.* at 249, 110 S.Ct. at 2371 ("Congress' avowed purpose [was] to prevent discrimination against religious and other types of speech[.]").

To fulfill the Act's broad purpose, the Court held that the Act must be given a "broad reading." *Id.* at 239, 110 S.Ct. at 2366. Only by interpreting "noninstructional time" to include lunch periods can we adhere to the Supreme Court's instruction and have our interpretation be "consistent with Congress' intent to provide a low threshold for triggering the Act's requirements." *See id.* at 240, 110 S.Ct. at 2366.

Although we hold that the lunch period at UCHS is noninstructional time, and that UCHS therefore impermissibly denied Ceniceros' group the opportunity to meet during that time, we emphasize that Ceniceros' group's right to meet is defined by the extent to which other groups were permitted to meet. It is unclear from the record, and indeed neither party could definitively answer at oral argument, whether the student

groups that met at lunch met *in classrooms.* If other noncurriculum groups were permitted to meet in classrooms, UCHS should not have denied classroom access to Ceniceros' group. Likewise, if those groups met on school grounds, but not in classrooms, Ceniceros' group was entitled to similar access under the Act.

Our decision today does not necessarily preclude school districts from disallowing religious groups from using school premises for meetings during lunch periods. The Act is about *equal* access. If a school district wanted to prohibit religious groups from meeting during lunch, the school need only make its prohibition neutral, so that all noncurriculum-related groups are barred from meeting at lunch. *Cf. Mergens,* 496 U.S. at 241, 110 S.Ct. at 2367 (The Act's obligation that schools treat student groups in a nondiscriminatory manner "is the price a federally funded school must pay *if* it opens its facilities to noncurriculum-related student groups.") (emphasis added). Nor would this interpretation prevent a school from making affirmative statements to dispel any mistaken impression of its endorsement of the religious club. *See id.* at 270, 110 S.Ct. at 2382–83 (Marshall, J., concurring in judgment) (arguing that school has an affirmative duty to disclaim endorsement of religious club); Douglas Laycock, *Equal Access and Moments of Silence,* 81 Nw. U.L.Rev. 1, 18 (1986) (suggesting that school can explain its open forum policy to avoid confusion about school endorsement of religious groups). Today we hold only that UCHS wrongfully discriminated against Ceniceros' student religious group by denying them equal access to school facilities during noninstructional time, such as UCHS' lunch period.[3]

## IV.

The District argues, and the district court found, that if the Equal Access Act requires that religious groups be allowed to meet during the lunch period, the Act violates the Establishment Clauses of both the federal and California Constitutions.

---

3. Since we find that the Act prohibited the District from precluding religious groups from meeting during lunch periods, we need not address

Ceniceros' Free Speech and Free Exercise claims. *See Mergens,* 496 U.S. at 247, 110 S.Ct. at 2370; *Garnett,* 987 F.2d at 643 n. 1.

## A.

■ With respect to the federal Constitution, the Supreme Court has recently addressed strikingly similar Establishment Clause challenges. In *Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), the Supreme Court held that, when a state university makes its facilities generally available, allowing equal access to a student religious group would not violate the Establishment Clause. *Id.* at 271–75, 102 S.Ct. at 275–77. Specifically, the Court reasoned that "an open-forum policy, including nondiscrimination against religious speech, would have a secular purpose and would in fact avoid entanglement with religion." *Id.* at 271–72, 102 S.Ct. at 275–76. The message of an open-forum policy is one of neutrality, not endorsement, while discriminating against religious groups would demonstrate hostility, not neutrality, toward religion. *Mergens,* 496 U.S. at 248, 110 S.Ct. at 2370–71; *see also Lamb's Chapel v. Center Moriches School Dist.,* 508 U.S. 384, 394–96, 113 S.Ct. 2141, 2148, 124 L.Ed.2d 352 (1993) (making school facilities available for religious group to show film does not violate Establishment Clause).

In *Mergens,* the Supreme Court applied this reasoning to the high school setting, specifically within the context of the Act's equal access requirements to after-school meetings. *Mergens,* 496 U.S. at 248, 110 S.Ct. at 2370–71. The Court emphasized the "crucial difference between *government* speech endorsing religion, which the Establishment Clause forbids, and *private* speech endorsing religion, which the Free Speech and Free Exercises Clauses protect." *Id.* at 250, 110 S.Ct. at 2372 (emphasis in original).

The Court also enumerated several other factors upon which it relied to reach its conclusion that the Act passed constitutional muster. It reasoned that "secondary school students are mature enough and are likely to understand that a school does not endorse or support student· speech that it merely permits on a nondiscriminatory basis." *Id.* The Court indicated that deference was due to the Act because it is the considered decision of a coequal branch. *Id.* at 251, 110 S.Ct. at 2372–73. The Court also pointed out

that attendance at the meetings is purely voluntary since "no formal classroom activities are involved and no school officials actively participate." *Id.* Any residual risk of mistaken inference of endorsement, the Court suggested, could be diffused by official school statements disavowing any endorsement. *Id.* Finally, the Court noted that the broad spectrum of student clubs at a school ensured the possibility of counterbalance against any perception of a message of official endorsement of religion. *Id.* at 252, 110 S.Ct. at 2372–73. All of these considerations are present in this case and compel the same result as *Mergens,* regardless of the fact that the meetings in this case would occur at lunchtime instead of after school.

The District attempts to distinguish *Mergens* by pointing to language in the text of the opinion that refers to the fact that the meetings at issue in *Mergens* occurred after school. The Court stated that "a school that permits a student-initiated and student-led religious club to meet after school, just as it permits any other student group to do, does not convey a message of state approval or endorsement of the particular religion." *Id.* This reference to the timing of the meetings at issue in *Mergens* merely provides factual context; it does not suggest that the timing of the meetings was an important factor upon which the Court based its decision.

The only timing issue with which the Court concerned itself in *Mergens* is the Act's restriction of meetings to "noninstructional time." *Id.* at 251, 110 S.Ct. at 2372–73. The Court found this limitation significant because it avoids the problem of mandatory attendance requirements, which the Court had previously struck down. *Id.* (citing *Edwards v. Aguillard,* 482 U.S. 578, 584, 107 S.Ct. 2573, 2577–78, 96 L.Ed.2d 510 (1987)). Since the lunchtime meetings proposed by Ceniceros would resemble in every significant respect the meetings approved by the Court in *Mergens,* permitting Ceniceros' group to meet during lunchtime would not violate the Establishment Clause.

The District's other efforts to distinguish *Mergens* are also unpersuasive. The District, and the district court, attempt to distinguish *Mergens* by suggesting that, in

contrast with after school meetings, "many students remain on campus" during lunch-time. The record does not reflect how many students are on campus after school as compared to the number during lunch-time. Even if there were a significant difference, however, the number of students who may observe speech does not affect their ability to distinguish between government-sponsored speech and student-sponsored speech, which is the "crucial difference." *Id.* at 250, 110 S.Ct. at 2371–72.

The District also argues that the presence of school employees required to monitor the meetings would create a risk of endorsement. Again, there is no indication in the record that school officials are more likely to be present during meetings that occur during lunch than meetings that occur after school. To the contrary, Administrative Procedure 6250, which was approved by the District and relied on by the vice principal who denied Ceniceros' request, indicates that school monitors may be present at any meetings in a nonparticipatory capacity, regardless of when they occur. Moreover, the Court in *Mergens* specifically rejected the notion that "such custodial oversight of the student-initiated religious group ... [would] impermissibly entangle government in day-to-day surveillance or administration of religious activities." *Id.* at 253, 110 S.Ct. at 2373.

The emphasis of the Court's decision in *Mergens* was that student-sponsored religious speech is very different from government-sponsored religious speech and that secondary school students are mature enough to understand the difference between neutrality toward and endorsement of religion. These criteria, along with the other factors reviewed by the Court, compel our conclusion that UCHS' neutral application of its lunchtime access policy would not violate the Establishment Clause.

### B.

With respect to the California Constitution, the District argues that the "no preference clause" in the California Constitution, which is more potent than the federal Constitution's Establishment Clause, provides a compelling reason for this court to interpret the Act to preclude meetings in school facilities during the school day. Because we hold that the plain meaning of the term "noninstructional time" includes meetings during the lunch hour, Ceniceros' rights under the Act exceed, and therefore supersede, those under the California Constitution. *Garnett v. Renton School Dist. No. 403*, 987 F.2d 641, 645–46 (9th Cir.) (finding that the Act does not permit schools to bar religious meetings on the basis that use of school for religious meetings would violate state constitution), *cert. denied*, 510 U.S. 819, 114 S.Ct. 72, 126 L.Ed.2d 41 (1993). At oral argument, the District agreed that under *Garnett* the Act would supercede the California Constitution if the Court were to find under the Act that Ceniceros had the right to meet in school facilities during the lunch hour. It is axiomatic that "states cannot abridge rights granted by federal law." *Id.* at 646.

### V.

For the foregoing reasons, the judgment of the district court is REVERSED, and the case is REMANDED for further proceedings in accord with this opinion.

REVERSED and REMANDED.

LAY, Circuit Judge, dissenting.

I respectfully dissent.

### I.

The Equal Access Act ("EAA" or "the Act") provides:

It shall be unlawful for any public secondary school which receives Federal financial assistance and which has a limited open forum to deny equal access or a fair opportunity to, or discriminate against, any students who wish to conduct a meeting within that limited open forum on the basis of the religious, political, philosophical, or other content of the speech at such meetings.

20 U.S.C. § 4071(a). Based on this anti-discrimination principle, Ceniceros and the religious groups, who have filed *amicus*

briefs, along with the United States,[1] argue that because other noncurriculum related student groups are allowed to meet during school lunch time at the University City High School (UCHS), it would constitute impermissible discrimination not to allow a student religious group to meet at the same time. On its face this syllogistic reasoning may seem sound, but the basic flaw in the argument's conclusion is the failure to acknowledge that religious activity in a controlled public school environment can never stand on equal footing as other secular noncurriculum activities.

In order to obviate possible church-state entanglement, Congress and the Supreme Court have both recognized that student religious clubs must meet certain conditions which do not necessarily pertain to secular groups. Under the EAA, the Supreme Court has made it clear that a school or its officials may not sponsor, endorse, promote, encourage, lead, advise, guide, direct or participate in any student religious group, although they generally may do all of those things for secular groups. *See Board of Educ. of the Westside Community Sch. v. Mergens,* 496 U.S. 226, 251–53, 110 S.Ct. 2356, 2372–74, 110 L.Ed.2d 191 (1990) (plurality opinion); *id.* at 261, 110 S.Ct. at 2377–78 (Kennedy, J., concurring in part and concurring in the judgment); *id.* at 269, 110 S.Ct. at 2382 (Marshall, J., concurring in the judgment). In addition, "nonschool persons may not direct, conduct, control, or regularly attend" the activities of student religious groups, but they may do so for secular groups. *See* 20 U.S.C. § 4071(c)(5). For example, UCHS could sponsor a chess club, its faculty could teach its students how to become better chess players, and students' parents could regularly assist students at chess club meetings, but in no way could the school or its faculty or the parents be allowed to sponsor a "UCHS Christian Club" or teach the club's members how to pray more effectively. More pertinent to our concerns here is that student religious group activities may only take place "before actual classroom instruction begins or after actual classroom instruction ends." 20 U.S.C. § 4072(4). There is no similar limitation restricting secular clubs. A school may freely allow students, during regular school hours to participate in any nonreligious, noncurriculum related activity without fear of violating Establishment Clause principles. The point is that Congress and the Supreme Court have both observed that a school may not discriminate against student religious groups *only as long as the activities of those student religious groups are circumscribed to conform to Establishment Clause principles.* This is a fundamental qualification that the arguments of Ceniceros, her *amici,* and the United States overlook. I offer the above considerations as relevant in understanding the differences between the majority's approach to interpreting the EAA and mine.

The majority opinion recognizes that religious student groups can only meet if (1) other noncurriculum related groups are allowed to meet *and* (2) such meetings occur

**1.** The United States filed a litigation brief in support of Cenicero's position. Since the argument of this case, this litigation position has been incorporated as part of "a statement of principles" provided to all school superintendents in a letter by the Secretary of Education. This letter states that under the Equal Access Act "student religious groups at public secondary schools have the same right of access to school facilities as is enjoyed by other comparable student groups." The letter further provides:

> "*Lunch-time and recess covered:* A school creates a limited open forum under the Equal Access Act, triggering equal access rights for religious groups, when it allows students to meet during their lunch periods or other non-instructional time during the school day, as well as when it allows students to meet before and after the school day."

Letter from Richard W. Riley, U.S. Secretary of Education, to School District Superintendents 6 (Aug. 10, 1995), *available from* U.S. Department of Education, Information Resource Center, Room 2134 FOB10, 600 Independence Ave., Washington, D.C. 20202, 1–800–USA–LEARN. Although the Department of Justice as well as the Secretary of Education may interpret the Equal Access Act in this manner, it is my judgment that this does not represent, for the reasons discussed below, the congressional intent of the EAA nor a proper constitutional view of the EAA. As I discuss, such an interpretation raises serious questions of encroachment on settled state-church principles under the Establishment Clause of the First Amendment.

during noninstructional time, as required under 20 U.S.C. § 4071(b).[2] The majority concludes, however, the "plain meaning of 'noninstructional time' ... includes the lunch period at UCHS." *Ante*, at 880.

Congress defined "noninstructional time" as "time set aside by the school before actual classroom instruction begins or after actual classroom instruction ends." 20 U.S.C. § 4072(4). The majority's interpretation of this clause is plausible, but I respectfully submit that there is a more reasonable interpretation. In my view, this language limits student religious activities under the EAA to the time "before actual classroom instruction begins" (before school starts) "or after actual classroom instruction ends" (after school is over). This was the factual basis on which the Supreme Court ruled in *Mergens. See* 496 U.S. at 231, 110 S.Ct. at 2362 (noting that student groups "all ... meet after school hours"). In this case, both the school district, trying to fend off an Establishment Clause challenge, and the district court interpreted "noninstructional time" as the time before the school day starts and after the school day ends. Indeed, the district court stated that "[i]t would be a strained reading of the definition to find that Congress intended the lunch period to be included under the definition."[3] The interpretation by the school district and the district court—as well

as my own understanding—all belie the majority's conclusion that the term "noninstructional time" as defined in § 4072(4) has an unambiguous "plain meaning" that should decide this case. Ceniceros conceded the ambiguity of the Act in her brief, quoting a statement from a law review article which observed " 'not even the sponsors of the bill knew what it meant.' " Douglas Laycock, *Equal Access and Moments of Silence: The Equal Status of Religious Speech by Private Speakers*, 81 Nw. U.L.Rev. 1, 38 (1986). Furthermore, Laycock's statement relating to the ambiguity of the Act was endorsed by the Supreme Court in *Mergens*, 496 U.S. at 242, 110 S.Ct. at 2367–68.[4]

Although I think the most reasonable interpretation of the statutory language excludes lunch-time meetings, at worst the statute is ambiguous. It is a well-settled principle that when a statute is ambiguous we should examine the legislative history to determine Congress's intended meaning. *Mergens*, 496 U.S. at 238, 110 S.Ct. at 2365–66 (citing *United States v. James*, 478 U.S. 597, 606, 106 S.Ct. 3116, 3121–22, 92 L.Ed.2d 483 (1986)); *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 737, 105 S.Ct. 1598, 1603–04, 84 L.Ed.2d 643 (1985).[5] The majority, however, avoids the study of legislative intent by arguing that the statutory language

2. Section 4071(b) provides that a "limited open forum" exists "whenever [a] school grants an offering to or opportunity for one or more non-curriculum related student groups to meet on school premises during noninstructional time." Under Ceniceros's proposed interpretation of the EAA, the very fact that other noncurriculum related student groups meet during school lunch time would mean that Congress intended the school lunch time to be interpreted as "noninstructional time." Under this approach, the phrase "during noninstructional time" becomes redundant and carries no meaning.

3. *Ceniceros v. Board of Trustees*, No. 93–1015–GT, at 4–5 (S.D. Cal., filed Dec. 22, 1993).

4. In the same article Professor Laycock opined that "[r]oughly equal numbers of statements on the floor of Congress go each way on the issue of activity periods during the day." Laycock, *Equal Access and Moments of Silence: The Equal Status of Religious Speech by Private Speakers*, 81 Nw. U.L.Rev. 1, 34 n. 163 (1986). With all due respect, the Laycock article does not appear to be a reliable authority on this point. Laycock's statement is not supported by references to the

legislative history, but rather by a citation to a footnote in a student article which has apparently been misread. The student's footnote concluded that, despite statements by Senator Denton and Representative Oakar in the legislative history interpreting § 4072(4) to allow school day meetings, the totality of the evidence showed that "[t]he House agreed to the Senate's narrower construction of 'noninstructional time.' " *See* John D. Thompson, Note, *Student Religious Groups and the Right of Access to Public School Activity Periods*, 74 Geo. L.J. 205, 217 n. 83 (1985).

5. It is true that *Mergens* said the legislative history of the Act is "less than helpful." 496 U.S. at 238, 110 S.Ct. at 2365–66. The Court's statement, however, related to the issue of what "non-curriculum related student group" means. On that point the legislative history is confused and contradictory. *See id.* On the question of what § 4072(4) means, by contrast, the legislative history is not only clear as to congressional intent, it is overwhelming.

is not only unambiguous but that the legislative history of the Act is "unhelpful."

Contrary to the majority's understanding, a thorough study of the legislative history of the EAA reveals overwhelming evidence that Congress intended § 4072(4) to mean before or after the school day.[6] Under the original version of the Act, Senator Denton's Senate Bill 1059, the phrase "noninstructional periods" was undefined yet intended to include portions of the regular school day, such as a lunch period. The early Senate Report discussing Senator Denton's original bill explained:

> "[N]oninstructional periods" means periods before, during, or after the regular school day, during which a student does not receive regular classroom instruction as part of the school's organized course of study. Under that definition, the term includes the hours immediately preceding or following the regular school day, as well as a lunch period, a study hall period, a homeroom period in which student choice of extracurricular activities is allowed, or a student activity period set aside for meetings of voluntary extracurricular student groups.

S.Rep. No. 357, 98th Cong., 2d Sess. 38 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2306, 2348, 2384. This interpretation, however, was explicitly rejected as the bill made its way through Congress.

The definition of "noninstructional time" now contained in § 4072(4) was added as part of Senator Hatfield's compromise amendment designed to gain passage of the bill. The amendment was viewed by its sponsor, Senator Hatfield, as limiting the statute's coverage to periods before and after the regular school day, as he said in debate on the floor of the Senate:

> *Mr. Metzenbaum.* Then I would ask the Senator on the last page of the amendment where he talks about that term "noninstructional time" means time set aside by the school before actual classroom instruction begins or after actual classroom instruction ends? [sic]
>
> *Mr. Hatfield.* That is the beginning of the day and the end of the day.

130 Cong. Rec. 19,234 (1984). Senator Hatfield explained that the compromise amendment originally contained language which covered "before school, after school, and/or during a period designated for activities during the instructional day," but that he had "deleted" the proposed reference to activity periods during the school day based on objections by parents who were concerned they could not control their children during the school day.[7] *Id.* at 19,234–35. Hatfield noted, however, that limiting the Act's scope to meetings before or after the school day was not a major concession because ninety percent of the school activity periods are "now preschool or postschool." *Id.* at 19,235.[8] *See also id.* at 19,223 (statement of Sen. Hatfield) (using phrase "before or after school"); *id.* at 19,235 (statement of Sen. Hatfield) (explaining why "homeroom" period would not be covered by the Act).[9] As the amendment's

---

6. The district court also found that the legislative history supported its interpretation of § 4072(4) that does not require schools to allow student religious groups to meet during school lunch time.

7. Senator Hatfield said that parents objected as follows:

> We don't even want a religious meeting occurring during the school day. I can control my children by having them there after 8:30 so they do not participate in something before school or I can pick them up at 3:30 so they cannot participate in it after school. I don't want that time in between where they may participate in activities.

*Id.* at 19,235.

8. The phrase "actual classroom instruction" was apparently used to allow student religious groups to meet during preschool or postschool activity periods. *See id.*

9. Other Senators shared Senator Hatfield's understanding of § 4072(4)'s definition of "noninstructional time." *See, e.g., id.* at 19,226 (statement of Sen. Metzenbaum) ("It intends to open the doors of schools after hours or before hours for religious groups to use the facilities ...."); *id.* at 19,235, 19,236 (statement of Sen. Levin) (assuming the Act applies to religious group meetings "outside of school hours," "after school," and "before and after school"); *id.* at 19,241 (statement of Sen. Nickles) (urging support for "equal access to school facilities to all student groups wishing to meet on a voluntary basis during nonschool hours."). Senator Durenberger argued that the fear of coercing a captive audience in schools was "demonstrably

sponsor, Senator Hatfield's explanation should be accorded significant weight. *See North Haven Bd. of Educ. v. Bell,* 456 U.S. 512, 526–27, 102 S.Ct. 1912, 1920–21, 72 L.Ed.2d 299 (1982) ("[R]emarks ... of the sponsor of the language ultimately enacted ... are an authoritative guide to the statute's construction."); *see also Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,* —— U.S. ——, ——, 115 S.Ct. 2407, 2427, 132 L.Ed.2d 597 (1995) (Scalia, J., dissenting) ("[W]hat those who brought the legislation to the floor thought it meant [is] evidence as solid as any ever to be found in legislative history....").[10]

The legislative history in the House of Representatives provides even stronger support for interpreting "noninstructional time" to exclude lunch-time meetings. Representative Bonker, who sponsored the original House bill and noted that the Senate had "greatly watered down our original intent," nonetheless stated that the Act "would merely mandate that before and after school, the equal access policy would be required." 130 Cong. Rec. 20,935, 20,945 (1984). Representative Smith of Nebraska, who had supported Representative Bonker's original bill, also acknowledged that the Senate amendment "applies only to groups meeting before or after school." *Id.* at 20,943. Many representatives who had refused to support Representative Bonker's original bill because it would have required schools to allow students to meet during the school day, now favored the bill in part because it was limited to before and after school. *See, e.g., id.* at 20,933 (statement of Rep. Frank); *id.* at 20,938 (statement of Rep. Ratchford); *id.* at 20,940 (statement of Rep. Williams); *id.* at 20,941 (statement of Rep. Miller); *id.* at 20,947 (statement of Rep. Smith (Iowa)); *id.* at 20,947 (statement of Rep. Slattery); *id.* at 20,948 (statement of Rep. Synar); *id.* at 20,949 (statement of Rep. Schneider).[11] Two representatives who opposed the measure expressed concern that the definition of "noninstructional time," while being promoted as meaning before or after school, was not clear enough to guide school administrators, *id.* at 20,938 (statement of Rep. Kastenmeier), or could be interpreted to allow meetings during the school day, *id.* at 20,942 (statement of Rep. Oakar). Their comments, however, confirm that Congress's understanding was that "noninstructional time" meant the Act

---

... groundless ... before or after school hours." *id.* at 19,239.

A number of other Senators used the phrase "noninstructional periods" that appeared in Senator Denton's original version of the bill, but this does not specifically address how "noninstructional time" should be interpreted. *See, e.g., id.* at 19,238 (statement of Sen. Durenberger); *id.* at 19,242 (statement of Sen. Mattingly); *id.* at 19,242 (statement of Sen. Mattingly); *id.* at 19,242 (statement of Sen. Jepsen); *id.* at 19,243 (statement of Sen. Dole); *id.* at 19,248 (statement of Sen. Grassley); *id.* at 19,249 (statement of Sen. Evans). Senator Grassley also used the phrases "during noninstructional hours" and "before or after class." *Id.* at 19,247, 19,248. Finally, Senator Cranston opposed the bill because he thought it could be used "to compel school districts to allow religious activity during the school day." *Id.* at 19,241.

10. The only specific statement in the legislative history favoring an interpretation of "noninstructional time" to include times during the school day was made by Senator Denton, the sponsor of the original bill. He stated first that he was concerned by the legislative history being forged by the Senate discussions of the compromise amendment. He then asserted that his interpretation of "noninstructional time" would include noninstructional periods during the school day,

including lunch period. 130 Cong. Rec. 19,237. It is clear from his colloquy, however, that Senator Denton was consciously trying to limit the impact of Senator Hatfield's compromise amendment. Given the narrower interpretation of the compromise amendment by its sponsor, the large number of statements supporting the narrow interpretation in both houses, and the bipartisan passage of the compromise amendment by wide margins, Senator Denton's comments carry little weight.

11. The statements of other Representatives showed they assumed the bill was limited to times before and after the school day. *See, e.g., id.* at 20,939 (statement of Rep. Clinger) ("after the schoolday has ended"); *id.* at 20,943 (statement of Rep. McEwen) ("outside of school hours").

Other Representatives referred to the timing of the student religious group meetings in a variety of ways. *Id.* at 20,944 (statement of Rep. Montgomery) ("during noninstructional hours"); *id.* (statement of Rep. Rogers) ("during noninstructional periods"); *id.* at 20,946 (statement of Rep. Packard) ("during noninstructional time"); *id.* at 20,948 (statement of Rep. Perkins) ("before and after instructional periods"); *id.* at 20,948 (statement of Rep. Hall) ("during off-hours").

only required schools to allow student religious groups to meet before and after school.

The majority's interpretation ignores the clear legislative policies that motivated the compromise bill. First, Congress obviously intended the compromise bill to protect the interests of parents to be involved in their children's religious decisions. *See id.* at 19,-235 (statement of Sen. Hatfield). Second, several Representatives wanted to limit student religious group meetings to before or after school to avoid interfering with or disrupting the educational mission of secondary schools. *See id.* at 20,940 (statement of Rep. Williams); *id.* at 20,941 (statement of Rep. Miller); *id.* at 20,943 (statement of Rep. Smith (Nebraska)). Third, the majority's interpretation will expose schools to more litigation over "the very gray question of what is noninstructional time" that § 4072(4) was in part designed to avoid. *See id.* at 20,938 (statement of Rep. Ratchford). Under the majority's interpretation, "noninstructional time" could include homeroom periods, study halls, recesses, and short breaks between class periods. "[N]oninstructional time" will vary from one school to another depending upon the environmental restrictions each school attaches to different periods during the day. Under the majority version, students may seek to hold three-minute prayer sessions between classes if any other student groups are permitted to have similar short meetings. This is not the specific guidance

school authorities need when dealing with Establishment Clause controversies. The law should not be so uncertain that school officials will face ongoing litigation from either side of the line of attack.[12] Surely this concern alone makes the interpretation of "noninstructional time" as limiting student religious activities to before or after the school day more reasonable by providing definitive guidance to all school districts as to when religious activity is to be allowed.[13]

The majority argues that its interpretation of "noninstructional time" is supported by the broad remedial purpose of the statute to allow equal access for religious and other groups previously excluded based on the content of their speech. They further claim that only by interpreting "noninstructional time" to include lunch periods can they adhere "to the Supreme Court's instructions" and have their interpretation be " 'consistent with Congress' intent to provide a low threshold for triggering the Act's requirements.' " *Ante,* at 881 (quoting *Mergens,* 496 U.S. at 240, 110 S.Ct. at 2366-67). This general purpose, however, cannot override the Congress's specific reason for adding the current definition of "noninstructional time" to the Act. Moreover, in *Mergens,* the Court discussed the "low threshold" requirement in the context of defining "noncurriculum related student group", not "noninstructional time." *See Mergens,* 496 U.S. at 237-40, 110 S.Ct. at

---

12. A California appellate court denied relief to a religious group in circumstances strikingly similar to this case, finding such a meeting during the lunch hour would violate both the federal and California constitutions. *See Johnson v. Huntington Beach Union High Sch. Dist.,* 68 Cal. App.3d 1, 137 Cal.Rptr. 43 (1977). In *Johnson,* the court found the group, a Bible study club, "would implicitly become an integral part of the school's extracurricular program conducted during the school day when students are compelled by law to attend the school." *Id.* 137 Cal.Rptr. at 50 (footnote omitted). According to the court, participation by this type of club would put an imprimatur on religious activity and thus violate the Establishment Clause. *Id.* at 49-50. The school district's decision in this case to deny lunch-time meetings was in part a response to *Johnson,* but unfortunately, the majority's interpretation will keep school districts squeezed between allowing religious groups to meet and trying to adhere to the constitutional command separating church and state.

13. Another plausible interpretation of § 4072(4) that would protect school authorities from this pincer attack is that Congress intended to give school authorities the discretion to decide for themselves whether to allow school religious groups to meet during open periods within the school day. This interpretation finds support from the language in § 4072(4) that "noninstructional time" is "time set aside by the school" and from statements in the legislative history. *See* 130 Cong. Rec. 20,945 ("It is within the discretion of the school administration, in keeping with district and circuit court opinions [on the Establishment Clause], as to whether noncurriculum related student groups may meet in noninstructional time during the schoolday. It is ... up to the school to define ... what constitutes 'noninstructional time' ...") (statement of Rep. Bonker). Under this interpretation, the school district would win based on its discretionary decision to not "set aside" the lunch period as "noninstructional time."

2365–67. The ultimate question in *Mergens* was whether schools could stop student religious groups from meeting at all by defining all non-religious student groups as "curriculum related," which would have eviscerated the importance of the EAA, rather than the more narrow issue here of "what time of day" may the student religious groups meet. There is no need to apply the broad remedial approach to make sure religious student groups may meet over the lunch period rather than before or after school.

Finally, the majority ignores the established rule of construction that a statute should be construed "so as to avoid substantial constitutional questions" when there are two or more reasonable interpretations of the statutory language. *United States v. X–Citement Video, Inc.,* 513 U.S. 64, ——, 115 S.Ct. 464, 467, 130 L.Ed.2d 372 (1994). This principle applies here and favors an interpretation of § 4072(4) that would limit student religious group meetings to before or after the school day. Unfortunately, the majority's interpretation forces us to address the substantial constitutional issue of whether lunch-time student religious group meetings in public secondary schools violate the Establishment Clause.

## II.

The majority believes that the school district's Establishment Clause defense to Ceniceros's claim is controlled by "strikingly similar" Supreme Court decisions rejecting such arguments. I must respectfully disagree. The majority first relies on *Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), but this case is not controlling. In *Widmar,* like the recent case of *Rosenberger v. Rector & Visitors of the Univ. of Virginia,* —— U.S. ——, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995), the Court determined that public universities could not use the Establishment Clause to prohibit religious groups from participating in each school's public forum on an equal basis as other student groups. *Id.* at ——, 115 S.Ct. at 2524; *Widmar,* 454 U.S. at 277, 102 S.Ct. at 278.

Obviously, the university environment is much more open and less structured than that existing in a secondary school during the regular school day; university attendance is noncompulsory; university students are more mature than secondary school students; and, in sharp contrast to high school students, university students are generally autonomous of their parents. Thus, the facts in *Rosenberger* and *Widmar* are clearly distinguishable from those in this case.

The majority's reliance on *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.,* 508 U.S. 384, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993), is also misplaced. In *Lamb's Chapel,* the Court rejected a school district's Establishment Clause argument for denying a religious group's request to use school facilities to show a religious film after school hours on an equal basis with other community groups. In explaining why there was no danger the community would perceive such access to be an endorsement of religion, the Court pointed out that the "showing of this film would *not have been during school hours.*" 508 U.S. at 394–96, 113 S.Ct. at 2148 (emphasis added).

*Mergens* also does not resolve the Establishment Clause issue here. In his opinion concurring in the four-justice plurality decision of *Mergens,* Justice Kennedy, joined by Justice Scalia, based his analysis on his reading of the statute that limited meetings to times "while school is not in session," 496 U.S. at 261, 110 S.Ct. at 2377 (Kennedy, J., concurring in part and concurring in the judgment), and on the particular facts of *Mergens, id.* at 262, 110 S.Ct. at 2378, which involved after-school meetings only. Justice Marshall, joined by Justice Brennan, discussed the "substantial risks" of subtle coercion associated with allowing student religious groups to use public school facilities, and emphasized that the Act should be construed "to avoid the risk of endorsement [by the school]." *Id.* at 269, 110 S.Ct. at 2382 (Marshall, J., concurring in the judgment).[14] Finally, the plurality said that "a school that

---

**14.** Justice Marshall read the Court's opinion as a "mandate that [schools] effectively disassociate themselves from the religious speech" taking

place within school facilities, such as by "affirmatively disclaim[ing] any endorsement of the Christian club." *Id.* at 270, 110 S.Ct. at 2382.

permits a student-initiated and student-led religious club to meet *after school*, just as it permits any other student group to do, does not convey a message of state approval or endorsement of the particular religion." *Id.* at 252, 110 S.Ct. at 2373 (emphasis added). The plurality found that the Act "avoids the problems of ... 'mandatory attendance requirements'" only by requiring meetings to be held during noninstructional time. *Id.* at 251, 110 S.Ct. at 2372–73 (quoting *Edwards v. Aguillard*, 482 U.S. 578, 584, 107 S.Ct. 2573, 2577–78, 96 L.Ed.2d 510 (1987)).

It is clear, then, that *Mergens* does not "compel the same result" for lunch-time meetings as for those after-school, as the majority believes. *Ante*, at 882. Such an interpretation slights the "sensitivity to the special circumstances that exist in a secondary school where the line between voluntary and coerced participation may be difficult to draw." *Mergens*, 496 U.S. at 261–62, 110 S.Ct. at 2378 (Kennedy, J., concurring in part and concurring in the judgment). A more careful analysis, I believe, shows that student religious group meetings during the school day have too much potential for the appearance of school endorsement and the risk of subtle coercion that runs afoul of the basic constitutional principle of separation of church and state.

In *Lee v. Weisman*, 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992), a post-*Mergens* decision invalidating the inclusion of an invocation and benediction in the form of a prayer during a graduation ceremony, the Court reiterated that the risks of subtle coercion and the appearance of the state's endorsement of religion are especially acute in the public school context:

As we have observed before, there are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools. Our decisions ... recognize, among other things, that prayer exercises in public schools carry a particular

risk of indirect coercion. The concern may not be limited to the context of schools, but it is most pronounced there. What to most believers may seem nothing more than a reasonable request that the nonbeliever respect their religious practices, in a school context may appear to the nonbeliever or dissenter to be an attempt to employ the machinery of the State to enforce a religious orthodoxy.

*Id.* at 592, 112 S.Ct. at 2658 (citations omitted). The same observation equally applies to a lunch-time religious exercise whether attendance is deemed voluntary or not. *See also County of Allegheny v. American Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U.S. 573, 593, 109 S.Ct. 3086, 3100–01, 106 L.Ed.2d 472 (1989) ("[T]he prohibition against governmental endorsement of religion precludes government from conveying or attempting to convey a message that religion or a particular religious belief is favored or preferred.") (quotations and emphasis omitted); [15] *Edwards v. Aguillard*, 482 U.S. at 584, 107 S.Ct. at 2577–78 ("Students in such institutions are impressionable and their attendance is involuntary. The State exerts great authority and coercive power through mandatory attendance requirements, and because of ... the children's susceptibility to peer pressure.") (citations omitted).

Allowing religious speech and meetings to take place during the lunch break, as Ceniceros wishes, is fraught with the dangers of subtle coercion, misperception, and endorsement described above, much more so than the after-school meetings allowed in *Mergens*. First, because school administrators and teachers regulate student schedules, are in control of their behavior, and are responsible for them during the school day, religious activities occurring during the school day could easily be perceived as part of the school's program. Moreover, during this part of the day, when the school has great control over students, it is likely that stu-

---

**15.** This formulation was adopted by six Justices in *Mergens*. *See* 496 U.S. at 249–50, 110 S.Ct. at 2371–72 (plurality) (quoting *County of Allegheny*, 492 U.S. at 593, 109 S.Ct. at 3100–01); *id.* at 264 n. *, 110 S.Ct. at 2379 n. * (Marshall, J., concurring in the judgment) (same).

dents will misperceive the school's "custodial" oversight of religious activities that the Act permits, *see* 20 U.S.C. § 4072(2), for approval, participation, or even endorsement. It seems quite easy for members of the community to identify religious activity with the machinery of the school (and the State) when such activity occurs on school property during the school day. As Justice Marshall said in *Mergens*, schools will lose their "neutral" character if they are even "perceived as conferring the *imprimatur* of the State on religious doctrine or practice." 496 U.S. at 264, 110 S.Ct. at 2379 (Marshall, J., concurring in the judgment).

Second, parents wield little effective control over their children during the regular school day. The majority places great emphasis on the fact that attendance on the school premises is not compulsory during the lunch break. This emphasis is misplaced. Unlike before or after school, most parents are unable to keep their children away from activities during the lunch period. *See* 130 Cong. Rec. 19,235 (1984) (statement of Sen. Hatfield). Thus, their children may be confronted by *or participate in* religious expression in the public schools that parents find offensive or harmful but from which they are unable to shield their children. In *Edwards v. Aguillard*, 482 U.S. at 584, 107 S.Ct. at 2577–78 the Court found that "[f]amilies entrust public schools with the education of their children, but condition their trust on the understanding that the classroom will not purposely be used to advance religious views that may conflict with the private beliefs of the student and his or her family." Student-initiated religious meetings during the school day, potentially led by student evangelists (or worse), threaten to violate the trust that parents place in schools not to usurp the family's role in inculcating religious values protected by the Constitution.

Third, simply because a student religious meeting is called "voluntary" does not necessarily mean it will be free from coercive pressures. *See Lee v. Weisman*, 505 U.S. at 593–95, 112 S.Ct. at 2659 (holding that a "voluntary" graduation ceremony was too co-

ercive under the circumstances to withstand Establishment Clause challenge); *cf. Mergens*, 496 U.S. at 269, 110 S.Ct. at 2382 (Marshal, J., concurring in the judgment) ("The State has structured an environment in which students holding mainstream views may be able to coerce adherents of minority religions to attend club meetings or to adhere to club beliefs.").

Students who are exposed to religious meetings in a close and closed environment may find it hard to refuse because they cannot just walk away from the premises. Although the majority places much faith in UCHS's "open campus" policy over the lunch period, which allows students to leave the school property, this policy is not sufficient to alleviate the dangers discussed above. Many students are effectively precluded from leaving school during the lunch break due to the lack of time (only forty minutes) or the lack of transportation, and most parents cannot retrieve students during the middle of the day. This may account for why the district court found that more than half of UCHS's students remain on campus during lunch. The result of the majority's holding is that those who *must* stay at school during lunch will be compulsorily exposed to the religious practices of their peers.

State involvement in recognizing student religious groups during the school day may create greater divisiveness and intolerance toward others who must sit back and idly watch. In many of our public schools the children are predominantly of the Christian faith. Tolerance to other religious or nonreligious beliefs, the essence of the Free Exercise Clause, may fall to the wayside if schools are required to recognize a majoritarian student religious group that advertises and promotes meetings over the lunch break. The resulting ostracism of the minority students who cannot take part is humiliating and offends recognized constitutional principles. *See Abington Sch. Dist. v. Schempp*, 374 U.S. 203, 208 & n. 3, 224–25, 83 S.Ct. 1560, 1564 & n. 3, 1572–73, 10 L.Ed.2d 844 (1963); *Engel v. Vitale*, 370 U.S. 421, 430–31, 82 S.Ct. 1261, 1266–67, 8 L.Ed.2d 601 (1962); *see also*

*McCollum v. Board of Educ. of Sch. Dist. No. 71,* 333 U.S. 203, 227, 68 S.Ct. 461, 473, 92 L.Ed. 649 (1948) (Opinion of Frankfurter, J.) ("The children belonging to ... non-participating sects will thus have inculcated in them a feeling of separatism when the school should be the training ground for habits of community....").

Ceniceros, however, argues that denying her religious group the right to meet during the lunch break would violate her First Amendment rights of free speech and free exercise of religion. Assuming that UCHS has established some kind of "public forum"[16] during the lunch period for student groups, the Supreme Court has firmly established that avoiding Establishment Clause violations is sufficient justification for excluding such groups from participation based on the content of their speech. *See Lamb's Chapel,* 508 U.S. at 394–96, 113 S.Ct. at 2148 (suggesting that the Establishment Clause is a valid defense to a claim that a school is discriminating based on the content of a group's speech); *Widmar v. Vincent,* 454 U.S. at 271, 102 S.Ct. at 275 ("We agree that the interest of the University in complying with its constitutional obligations may be characterized as compelling."). Likewise, the Free Exercise Clause cannot be used to force government to accommodate religion in ways that violate the Establishment Clause. *Lee v. Weisman,* 505 U.S. at 586–88, 112 S.Ct. at 2655. *See also Peloza v. Capistrano Unified Sch. Dist.,* 37 F.3d 517, 522 (9th Cir.1994) (per curiam) (upholding school's restrictions on teacher's religious speech during lunch time), *cert. denied,* — U.S. —, 115 S.Ct. 2640, 132 L.Ed.2d 878 (1995).

## CONCLUSION

This case is not just over the meaning of words. There are higher stakes involved here relating to the freedom of all religious institutions. Those who urge further integration of state and church-even their symbolic merger-although well intended, unwittingly further denigration of the right to worship freely without state controls.[17] *See Lee v. Weisman,* 505 U.S. at 588–89, 112 S.Ct. at 2656. *Schempp,* 374 U.S. at 222, 226, 83 S.Ct. at 1571–72, 1573–74; *Engel v. Vitale,* 370 U.S. at 430–32, 82 S.Ct. at 1266–68. The fact that the state designates the times when student religious clubs can meet, prohibits the regular participation of parents and outside religious leaders, exerts control over the behavioral conduct of those attending students, requires the schools to disavow sponsorship of the clubs, and regulates the

---

**16.** In an alternative holding, the district court found that UCHS's lunch period does not qualify as a public or limited public forum. Distinguishing *Widmar,* the court found that public high schools are different from public universities because they are generally not open to the public nor known as forums for political and other speech. Because it found no public forum exists, the court concluded that the school's restriction on religious speech was valid because it was reasonable and viewpoint neutral.

In *Mergens,* however, the Supreme Court recognized that limited public fora can exist in high schools. 496 U.S. at 246, 110 S.Ct. at 2369–70. Thus, contrary to the district court's view, it is clear that a limited public forum for expressive activity can exist at UCHS. Nevertheless, I question whether a true limited public forum is possible during a time of the school day when attendance is compulsory or effectively compulsory. The fora analyzed in *Mergens, Widmar,* and *Lamb's Chapel,* were truly non-compulsory; if participants in these fora felt they did not wish to be exposed to certain speech, they could simply choose not to attend or remove themselves from the property at any time. Yet in this case, as described above, although the students are not required to attend the religious meetings, they cannot completely avoid confronting this type of speech because some of them are effectively precluded from leaving the premises.

**17.** As Justice Black wrote for the Court in *Engel v. Vitale:*

[The] first and most immediate purpose [of the Establishment Clause] rested on the belief that a union of government and religion tends to destroy government and to degrade religion. The history of governmentally established religion ... showed that many people had lost their respect for any religion that had relied upon the support of government to spread its faith. The Establishment Clause thus stands as an expression of principle on the part of the Founders of our Constitution that religion is too personal, too sacred, too holy to permit its "unhallowed perversion" by a civil magistrate. 370 U.S. at 431–32, 82 S.Ct. at 1267–68 (footnote omitted) (quoting *Memorial and Remonstrance against Religious Assessments, II Writings of Madison,* 183, 187).

club's members who seek to engage in evangelistic activities on school premises hardly supports the concept of freedom of worship for any faith. It is demeaning to any religious group to subject itself to such state restrictions. The established doctrine governing separation of state and church precludes encroachment, however small, and thus, I conclude that what the majority approves today violates the principles of that doctrine. Edmund Cahn put it best when he wrote in 1961:

> It is time to return soberly to the wisdom of the Founding Fathers. The churches which so many of us cherish are in grave jeopardy. Since their beginnings when our ancestors suffered and sacrificed to build them, they have faced no deadlier threat. The outlook is not a bit less ominous because those who propose to intermingle the church with the political state happen to be well intentioned. Regardless of denominations, creeds, and intentions, they are dangerously misguided. All church members-Catholics and Protestants, Jews and Christians-have the same interest in resisting them. As Elihu Root said, "It is not a question of religion, or of creed, or of party; it is a question of declaring and maintaining the great American principle of eternal separation between church and state."
>
> True, maintaining the principle may cost us inconvenience, misunderstanding, and even hostility. But did fear of embarrassment silence Jefferson or Madison? Like them, we consider the wall of separation indispensable to both church and state, and to our country's freedom.
>
> Indispensable we know it is to the welfare of the churches; but why is it equally indispensable to the political state? Because today, more than ever before, the government of the most powerful democracy on earth needs the critical scrutiny of independent churches, their visions, exhortations, and unsparing rebukes. Organized religion knows no higher duty than to maintain the enduring ideals and universal values that exceed the jurisdiction of any earthly power, transcend the widest political boundaries, and defy the currents of popular opinion. The louder the voice of the people in a society, the more it requires the inner monitions of religious conscience.
>
> In recent years, the inroads and encroachments have grown serious. If we do not speak out for principle today, we or our children may later have to fight for it. A little retreat, a little delay, a little appeasement-these will only encourage the misguided to attempt further aggressions. Silence has become too costly; we can no longer afford it. A little candor, a little courage, a little intransigence exhibited openly here and now-these will surely preserve the integrity of our religious institutions. The times have summoned us.

Edmund Cahn, Confronting Injustice 175 (1962).

For the reasons stated, I would affirm the district court.